IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

       Plaintiff,               CR. NO. S-06-0331 EJG (GGH)

   vs.

DAVID JOHN CARLI,

       Defendant.        <u>ORDER</u>

_____/

*Introduction and Summary*

On August 25 and 29, 2006, the court held an evidentiary hearing in the matter of defendant's (Carli) detention or release on conditions. The United States had sought Carli's detention on grounds of flight risk and danger to the community. For the reasons set forth below, the court finds that conditions could be fashioned to reasonably assure Carli's appearance if released, but that the government has demonstrated by clear and convincing evidence that no conditions reasonably exist which would assure the safety of the community if Carli were to be released.

*Background*

Carli was indicted on August 17, 2006, on two counts of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). One of the counts concerns matters

1

1   occurring in 2002, the other in 2004.  The reasons for the relatively belated submittal of these

2   matters for United States Attorney action are not completely known to the undersigned, but it

3   appears to have been caused by at least one state prosecution for actual molestation gone

4   somewhat awry.  The "awry" plays a role in the facts pertinent to the detention issue which are

5   discussed below.

6   _Legal Standards_

7            "Possession" of child pornography, unlike "receipt" of such (18 U.S.C.

8   2252(a)(2)) is not a presumptive detention offense.[1]  See 18 U.S.C. § 3142 § (e).[2]  However, it is

9   defined as a crime of violence, § 3156 (4)(C)[3], which is a trigger for finding "danger to the

10  community if released" if the circumstances and proof so warrant.  § 3142(f)(1)(A).

11           Release on conditions is the general rule, and not the exception:

12           The Bail Reform Act of 1984, 18 U.S.C. §§ 3141, et seq., requires
             the release of a person facing trial under the least restrictive
13           condition or combination of conditions that will reasonably assure
             the appearance of the person as required and the safety of the
14           community. 18 U.S.C. § 3142(c)(2); United States v. Motamedi,
             767 F.2d 1403, 1405 (9th Cir.1985).  Only in rare circumstances
15           should release be denied, and doubts regarding the propriety of
             release should be resolved in the defendant's favor.  Motamedi,
16           767 F.2d at 1405.  On a motion for pretrial detention, the
             government bears the burden of showing by a preponderance of the
17           evidence that the defendant poses a flight risk, and by clear and
             convincing evidence that the defendant poses a danger to the
18           community.  Id. at 1406-07.

19  U.S. v. Gebro,  948 F.2d 1118, 1121 (9th Cir. 1991).

20  \\\\\

21  \\\\\

22  _____

23       [1]  It is difficult to precisely understand how child pornography could be possessed without
     having been received as those terms are utilized in the statute.  However, "receipt" connotes
24   more affirmative acts of direct acquisition than does mere "possession."

25       [2]  All further references to criminal statutes are to Title 18 unless otherwise specified.

26       [3]  Chapter 110 encompasses the indicted offenses here.

1          <u>Danger to the Communbity</u>

2          The following factors found in § 3142(g) should be considered in determining

3    whether a person poses danger to the community:

4          (1)  The nature and circumstances of the offense charged, including whether the

5    offense is a crime of violence;

6          (2)  The weight of the evidence against the person;

7          (3) The history and characteristics of the person, including –

8                (A) the person's character, physical and mental condition, family ties,

9    employment, financial resources, length of residence in the community, community ties, past

10   conduct, history relating to drug or alcohol abuse, criminal history, and record concerning

11   appearance at court proceedings; and

12               (B)  whether, at the time of the current offense or arrest, the person was on

13   probation, on parole, or on other release pending trial, sentencing, appeal, or completion of

14   sentence for an offense under Federal, State, or local law; and

15               (4) The nature and seriousness of the danger to any person or the community that

16   would be posed by the person's release.

17          "We have observed that it was Congress's intent that the 'safety of any other

18   person' include the defendant's level of dangerousness to any identifiable individual, notably a

19   victim or witness." <u>United States v. Norris</u>, __F.3d__, 2006 WL 1889654 (11th Cir. 2006).

20          <u>Flight Risk</u>

21          The very same factors apply to consideration of flight risk; however, the focus on

22   application is completely different.  Whether one will commit injury does not necessarily relate

23   to one's propensity to appear in court.  Obviously, there is risk of flight in every decision to order

24   release pretrial.  No adjudicating official can probe the present and future mind set of a defendant

25   in such verifiable detail to guarantee that no flight will occur.  Nevertheless, the law does not

26   require such absolute assurance, <u>United States v. Orta</u>, 760 F.2d 887 (8th Cir. 1985); rather, it is

1   the government's burden pretrial to demonstrate that no conditions or combinations of conditions

2   can be set which *reasonably* will assure the defendant's appearance.  Congress has indicated that,

3   overall, pretrial release is the rule, and detention is the exception.  As observed above, "[o]nly in

4   rare circumstances should release be denied, and doubts regarding the propriety of release should

5   be resolved in the defendant's favor."  <u>United States v. Gebro</u>, <u>supra</u> at 1121 (citing <u>United States</u>

6   <u>v. Motamedi</u>, 767 F.2d 1403, 1405 (9th Cir. 1985)).

7          There are some crimes by their nature which suggest flight, e.g., prison escape,

8   and some crimes which do not suggest flight at all, e.g., non-aggravated battery.  Also very

9   pertinent to this category is the potential, realistic sentence to be imposed if the defendant is

10   found guilty.  It takes no extensive exercise in logic to realize that the more potential time one

11   can be locked away in prison, the more tendency there may be to flee.  Moreover, the older one

12   happens to be, the danger of flight becomes more apparent if any sentence to be imposed will

13   essentially be coextensive with one's life expectancy.

14   *Analysis*

15          The court will not extensively discuss flight risk here.  The government argues

16   that because the defendant has substantial assets, he is a candidate for flight.  In the ordinary

17   case, the opposite argument is made – because the defendant has no assets he is a flight risk.

18   Defendant has substantial assets, but they are non-liquid, real estate assets.  They are also not in

19   the sole control of this defendant but are also controlled by the uncharged defendant's brother.

20   Although some of the assets generate income, it is unrealistic to believe that the income could be

21   directed to a foreign, secret place, or that defendant's brother would commit a crime by aiding

22   the flight of his brother by forwarding income to him.  In short, conditions could be fashioned,

23   \\\\\

24   \\\\\

25   \\\\\

26   \\\\\

i.e., tying up the real property with significant bond liens, which would reasonably assure the appearance of this defendant.[4]

Danger to the community is the real point of contention here.  The court heard testimony, ranging from persons who testified as having been molested as a child by Carli all the way to persons who to this day think of him as a kind "Grandpa."  The court heard of numerous investigations, observations, accusations and speculation concerning Carli's activities.  Grossly conflicting accounts were presented of witness intimidation – grossly conflicting even from the same person himself.  The government argued that Carli could not be released given his record of child molestation and intimidation.  Carli argued that none of the government's witnesses could be believed.  The undersigned will make his findings below.

The undersigned pauses to make explicit here what he said at hearing.  It is not the function of a judge hearing a detention matter to punish a person for past misdeeds, proven or not.  Rather, the sole focus is the *present* potential danger to the community if the defendant were to be released pretrial, and whether conditions could be imposed which would reasonably alleviate the danger.

<u>Nature and Circumstances of the Charges, and Whether the Charge is a Crime of Violence</u>

Congress has thought it prudent to elevate possession of child pornography to a "crime of violence" status; this is Congress' way of telling judges that special caution should be exercised before releasing a person charged with such an offense.  Even persons who simply possess child pornography, and are not latent or patent pedophiles in their own right (perhaps not realistically possible), are tacitly encouraging the trade in child exploitation.  This is dangerous to society.  While conditions could be imposed to make access to child pornography more difficult,

---

[4] Although Carli is in his 60's, and a significant sentence would cut into his remaining years, the posting of adequate bond would be a satisfactory deterrent in this case.  It is also difficult for a person in the mid-60s to simply pick up and move (without real access to resources) to a secretive or foreign place.

1  the government is not in the position to realistically monitor on a quasi-"real time" basis the

2  reading/viewing propensities of the defendant.  The Ninth Circuit decision in United States v.

3  Scott, 450 F.3d 863 (9th Cir. 2006) (as amended), either wittingly or unwittingly, took away from

4  the district court a valuable tool in this respect.  No longer can a court impose conditions which

5  would permit law enforcement to search a pretrial releasee unannounced without probable cause.

6  *Even if a defendant, pre-trial releasee expressly waives his Fourth Amendment rights*, the Ninth

7  Circuit held that such a waiver was coerced and unenforceable.  Thus, the ability of pretrial

8  services or law enforcement to protect the safety of the community, as Congress has seen fit to

9  define it, is greatly reduced, and what once was a very viable condition to alleviate the danger in

10  this type of case is unavailable.  The tool of "pre-agreed to" consent searches was especially

11  important where the evidence demonstrated that the defendant, as here, is a long time, heavy

12  child pornography user.[5]  The nature of the charge, and the inability to supervise the defendant in

13  respect to similar activities, weigh in favor of detention.[6]

14          The court has considered the circumstance that, as far as child pornography charges

15  go, the present charges are quite dated.  The argument could (and was) made – what makes the

16  defendant a danger now, if the government did not for years see fit to get him out of the

17  community by arrest – why is he now a clear and present danger?  However, the evidence

18  demonstrated that a different sovereign (Nevada City/County) acquired the child pornography and

19  was pursuing the more serious charges of actual child molestation at least in 2004.  The fact that

20  the child witnesses were intimidated (if the government is to be believed) or otherwise recanted

21  \\\\\

22

23          [5]  Scott made clear that the government's interest in preventing further crime is not a
   "special need" which would permit searches on less than probable cause.  450 F.3d at 870.

24

25          [6]  The undersigned does not view this discussion as one punishing a potential releasee for
   assertion of Fourth Amendment rights.  The simple point is that if a condition is unavailable for
   use, it is unavailable – period – no matter what the reason.  The detention issue must be viewed
26  in the context of what viable conditions may be ordered.

1   for their own reasons, which made the prosecution very difficult, the United States did not

2   acquiesce in Carli's non-arrest.

3           The Weight of the Evidence

4           The weight of the evidence is strong at this point.  No less than tens, possibly

5   hundreds, if not thousands, of unlawful pictures have been seized.  The defense has not at this

6   point indicated that the pictures are computer created (virtual) child pornography, nor has any

7   indication been made thus far that strong Fourth Amendment violation claims may be sustainable

8   here with respect to the pictures.  The court presumes at this point that the Grand Jury indictment

9   is valid.  Although the least important factor in a detention analysis, United States v. Winsor, 785

10   F.2d 755, 757 (9th Cir.1986), the weight of the evidence remains a factor and weighs against

11   release.

12           The Person's Character, Past Conduct, etc.

13           This factor encompassed most of the hearing testimony.  At first, the government

14   proffered investigatory reports through a Nevada City police officer (who also was tasked with

15   working with the County Sheriff's Department), Sergeant Badour.  The reports included

16   interviews of actual child molest victims – victims of Carli.  Sgt. Badour focused on three

17   individuals, Ben and John, and another boy who had been interviewed by a private investigator.

18   According to Badour, both Ben and John, boys who were either runaways (John), or over whom

19   parents exercised little supervision (Ben), were drawn to Carli's house by promises of food, beer

20   and marijuana.  Both Ben and John were later offered money to engage in sex acts for Carli.  Ben

21   was sodomized by Carli on several occasions when he was underage.  After agreeing to perform

22   one act of masturbation for money, John refused further sexual overtures by Carli.  Badour also

23   related that a third boy, interviewed by Deborah Newby, broke down when confronted with

24   questions about Carli's activities to the extent that he could not be questioned further.  Sgt.

25   Badour also spoke of Carli's paying for gifts, at times expensive gifts, for many boys who would

26   come to his house.  There was no doubt that the Carli house often had numerous young boys and

7

1   some young women at his (and his brother's) household.  Importantly, Sgt. Badour testified that

2   both Ben and John had been threatened by Carli for their perceived assistance to law enforcement

3   concerning Carli's activities.  Ben had been beat up, and John believed that he was the subject of a

4   possible hit/murder instigated by Carli.

5   Badour also testified concerning the 2002 and 2004 search warrants and charges

6   against Carli.  In 2002, Carli was charged with cultivation of marijuana and possession of

7   marijuana for sale.  The 2002 search of the Carli residence revealed not only evidence of

8   marijuana usage, but also numerous indicia of adult and child pornography.[7]  Especially pertinent

9   was this annotation from the report of the searching officer (Govt. Exhibit 3): "Around the

10  computer, I located (17) Digital photos and pictures of young boys involved in sexual acts.  The

11  items appeared to be downloaded from the computer."  However, Carli was only charged with

12  marijuana offenses to which he ultimately pled to a misdemeanor count of possession of over one

13  ounce of marijuana.  No charges were filed concerning child pornography, and the undersigned

14  remains unsure why such were not filed in state court.

15  The 2004 search warrant and charges against Carli stemmed for the most part from

16  allegations Ben had leveled at Carli concerning molestation when Ben was a minor, and continued

17  distribution of marijuana to young children.  Under police supervision, Ben (now an adult) was

18  given marijuana by both David and Daniel Carli.  A search warrant was later executed (with

19  young boys present in the Carli house).  Amounts of marijuana were found throughout the house

20  and on the person of Carli.  More indicia of pornography and child pornography were seized.

21  Both Carlis were arrested; David Carli was also charged with molestation stemming from Ben's

22  complaints.

23  Again, however, Carli pleaded only to a misdemeanor marijuana charge.  Ben had

24  retracted all his molestation charges against Carli, and Ben had sex charge troubles of his own

25  ─────────────

26  [7] No evidence has been produced before the undersigned to indicate at this time that the
2002 search was overbroad.

1   (sex with a minor).  Again, there is no clear record of why child pornography charges were not

2   pursued in state court, but the educated guess is that the prosecution's case had fallen apart with

3   the retraction as well as the fact that Ben failed to appear in proceedings connected with the Carli

4   case.

5           At the conclusion of Sgt. Badour's testimony, and because Sgt. Badour had related

6   that Ben was now willing and able to testify, the court determined that it required this testimony,

7   especially about the witness/victim threats.  Ben appeared for testimony and John did as well.

8   John commenced the testimony.  Both John and Ben recounted that, when they were minors, Carli

9   would attempt to entice some, but not all, boys present in the Carli home for sexual favors.  Ben

10  testified, reluctantly, about his own experiences in submitting to Carli's sexual requests.  The

11  undersigned will not repeat all descriptions given by the two witnesses.  However, testimony was

12  received about payment for sexual acts, Carli's fascination with viewing semen from boys under a

13  microscope, and the routine supply of marijuana and alcohol to minors.  John testified that he had

14  been told that a contract was out for him because of his cooperation with police in this case.  Ben

15  recounted several violent, retribution type incidents which he correlated to his activity on behalf

16  of the police.  Both witnesses, especially Ben, were impeached by their own criminal activity

17  (relatively petty in the case of John).  Counsel for Carli brought out and emphasized the fact that

18  Ben had first related his victim status to the police when under arrest for his own sex charges.

19  Ben was especially impeached about retribution when it turned out that, concerning the most

20  important incident – a mass battery – he had told the police initially he believed the cause to be his

21  own involvement with the underage girlfriend – not the doing of Carli.

22          The undersigned listened closely to John's and Ben's testimony.  Despite the

23  impeachment on several matters, the undersigned found them credible with respect to their

24  testimony about Carli's sex-with-minors.  John was visibly angry at Carli, and at times would

25  look directly at him and call him a monster.  Ben was shaken and despondent about his more

26  serious sexual activity with Carli.  The undersigned did not find these emotions practiced or

1   feigned.  However, what impressed the undersigned most of all with their testimony was that,

2   despite the fact that these two had not spoken to each other, at least recently, about what

3   transpired in the Carli household, the testimony was similar in so many respects.  The undersigned

4   had to wrestle with Ben's one-time retractions, as well as the circumstances in which he related

5   the abuse to authorities; however, Ben's in-court under oath testimony was credible in respect to

6   the sex charges.  Moreover, the testimony of both John and Ben was buttressed by that other

7   testimony by Sgt. Badour (including the victim that broke down upon questioning) concerning the

8   unlawful sexual advances made by Carli.  Furthermore, Carli has been indicted on child

9   pornography charges.  Such makes the testimony of John and Ben with respect to the illicit sexual

10  acts much more probable than not.

11          The court also refers to the rather strange rambling letter written by Carli (half will

12  and testament and half philosophizing), discovered in the 2002 search warrant execution in which

13  he wrote:

14          Most females are stupid emotional wrecks, they raise sons who are
            stupid female controled (sic) males.
15          A german (sic) study of 8,000 boys who were molested, showed
            than (sic) not one had a life time negative effect, even boys who
16          were forced.  Don't make victims out of boys[.] [L]et them become
            men.  Only men can make a boy a man.  Females only make a boy a
17          good boy man...

18  Govt. Exhibit 1

19          Strange indeed – and the letter is indicative of a mindset which believes child

20  molestation is good for minors.  Nothing in this letter conflicts with the testimony of John and

21  Ben; the letter adds to the credibility of such testimony.

22          The undersigned was not persuaded by Carli's character witnesses who spoke of

23  Carli as a "Grandfather" figure.  These witnesses, for the most part, would not even concede that

24  marijuana and alcohol were supplied to minors despite the fact that even on the search warrant

25  days, such was found all over the house.  While Carli chose his victims for sexual favors, and

26  apparently not everyone was chosen, the undersigned finds that such illicit sexual activities took

10

1   place.  The whole "young boy atmosphere," including their ubiquitous presence, and the

2   exorbitant gifts were simply too strange to be explained by some altruistic intent.  The painting of

3   the Carli household as one simply to benefit wayward boys, and sometimes girls, is hardly one

4   based in reality.

5          The undersigned cannot find, however, by clear and convincing evidence, that

6   Carli has engaged in witness intimidation.  While the government has certainly raised this

7   possibility by virtue of the evidence presented, in that John and Ben have been subject to

8   undisputed violent threats and acts, the link to Carli is speculative at best.  In addition, Ben

9   initially linked the assaultive activities to his own problems and not that of Carli's activities with

10  him.

11  The Nature and Seriousness of the Danger to Any Person or the Community That Would

12  Be Posed by Carli's  Release

13         Congress had something in mind when it made possession of child pornography a

14  danger to the community triggering offense, i.e., a crime of violence.  Obviously, Congress was

15  concerned that one arrested for such possession might just continue assisting the exploitation of

16  children, if released, see U.S. v. Devinna, 5 F. Supp. 2d 872, 873-874 (E.D. Cal. 1998), and that

17  persons who possessed such pornography might well engage in molestation themselves, see

18  United States v. Coffey, 2001 WL 1249684 (N.D.N.Y. 2001).  Again, the point to be decided here

19  is whether, despite those Congressional concerns, conditions may exist which would reasonably

20  assure the safety of the community if Carli were to be released.  The undersigned finds not.

21         Most significantly, after the Scott decision, little in the way of effective monitoring

22  could be performed, either with respect to viewing child pornography or having minors over to the

23  Carli home.  Carli was evidently unimpressed with his earliest brush with the law, and continued

24  to maintain child pornography at his house which was thereafter seized during the 2004 warrant.

25  In light of his "commitment" to making "real men," and his self-professed philosophy, the court

26  does not find it likely that he would refrain from either acquiring more child pornography or

11

1    subjects for his sexual endeavors.  This is a valid basis on which to find danger to the community.

2    Cf. U.S. v. Turchen, 187 F.3d 735, 742 (7th Cir. 1999).[8]   Moreover, in light of his rather constant

3    distribution of marijuana, and his refusal to abstain from such even after his initial 2002 charges,

4    the court finds it unlikely that he would refrain from distributing marijuana or alcohol to minors.

5    *Conclusion*

6            The court finds that the factors warranting detention predominate, and that the

7    government has shown, by clear and convincing evidence, that defendant Carli would be a danger

8    to the community, if released.  The court further finds that conditions to reasonably assure the

9    protection of the community do not exist in Carli's case.  He shall be detained on that basis.

10   DATED: 9/6/06

                                      /s/ Gregory G. Hollows

11                                    _____

12                                    GREGORY G. HOLLOWS
                                      UNITED STATES MAGISTRATE JUDGE

     GGH:gh:035
13   carli.det

14

15

16

17

18

19

20

21

22

23
     _____

24          [8] "The government also points out that this record reveals that Mr. Turchen posed a risk
     of recidivism and remained a danger to the community. His child pornography distribution over
     the internet and his collection of pornography in his home, amassed after his "rehabilitation,"
25   show that there is no error, plain or clear, in the court's way of looking at the undisputed facts.
     Indeed, the district court's explicit mention of its obligation 'to protect society' suggests strongly
26   that the court was concerned about the possibility of recidivism."

                                      12