1  BENJAMIN B. WAGNER
   United States Attorney
2  MATTHEW STEGMAN
   Assistant U.S. Attorney
3  501 I Street, Suite 10-100
   Sacramento, California  95814
4  Telephone:  (916) 554-2793

**FILED**

DEC - 7 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
        DEPUTY CLERK

5

6

7                 IN THE UNITED STATES DISTRICT COURT

8            FOR THE EASTERN DISTRICT OF CALIFORNIA

9  UNITED STATES OF AMERICA,        )   CASE NO: CR-S-06-331-EJG
                                    )
10                    Plaintiff,    )   [PROPOSED] ORDER DENYING
                                    )   DEFENDANT'S MOTION TO
11             v.                   )   SUPPRESS EVIDENCE AND
                                    )   STATEMENTS
12  DAVID JOHN CARLI,               )
                                    )
13                    Defendant.    )
    _____)

14

15      On November 19, 2009, the defendant filed a motion to suppress

16  evidence and request for evidentiary hearing pursuant to _Franks_

17  _v. Delaware_.  C.R. 45.  On January 8, 2010, the government filed

18  an opposition brief.  C.R. 52.  On January 25, 2010, the

19  defendant filed a reply brief.  C.R. 55.  On January 29, 2010,

20  the Court held a non-evidentiary hearing on the motion to

21  suppress.  C.R. 56.  At that hearing, the Court denied the motion

22  to suppress as to search warrants numbered SW2161, SW2163, and

23  SW2164 issued by the Nevada County Superior Court, and provided a

24  detailed analysis on the record.  _Id_.

25      The Court set an evidentiary hearing as to search warrant

26  numbered SW2353 issued by the Nevada County Superior Court and

27  search warrant numbered 05-SW-354 issued by the United States

28  District Court for the Eastern District of California.  _Id_.

1    On March 16, 2010, prior to the evidentiary hearing, the

2    government filed supplemental points and authorities.  C.R. 61.

3    On March 22, 2010, the Court heard further argument on the

4    motion.  C.R. 62.  The defendant filed a response brief on May 5,

5    2010, with the government filing a reply brief on May 6, 2010.

6    C.R. 64, 66.  The Court held further proceedings on May 7, 2010,

7    and set the evidentiary hearing for May 12, 2010.  C.R. 67.

8        The evidentiary hearing was held over a number of days on

9    May 12, May 18, May 25, and November 19, 2010.  C.R. 68, 69, 71,

10   75.  On November 19, 2010, the Court denied the remainder of the

11   defendant's motion from the bench, that is, as to search warrants

12   numbered SW2353 and 05-SW-354, and provided a detailed analysis

13   on the record.  C.R. 75.

14       For the reasons stated on January 29, 2010, and November 19,

15   2010, the defendant's motion to suppress is hereby DENIED.  The

16   transcripts of the above two hearing dates are attached to this

17   Order and hereby incorporated by reference.

18

19   DATED:    12/7/10

20

21

22                              EDWARD J. GARCIA
                               United States District Judge

23

24

25

26

27

28

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3                       ---oOo---

4    UNITED STATES OF AMERICA,        )
                                      )
5                        Plaintiff,   )
                                      )
6    vs.                              )Case No. CR-S-06-0331 EJG
                                      )
7    DAVID JOHN CARLI,                )
                                      )
8    _____Defendant.  )

9                       ---oOo---

10          BEFORE THE HONORABLE EDWARD J. GARCIA, JUDGE OF
     THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF
11   CALIFORNIA, AND ON JANUARY 29, 2010.

12          REPORTER'S TRANSCRIPT OF PROCEEDINGS
                HEARING - MOTION TO SUPPRESS
13

14   APPEARANCES:

15   For the Plaintiff:    MATTHEW C. STEGMAN, ASST. US ATTORNEY
                           U.S. ATTORNEY'S OFFICE
16                         501 I Street, Suite 10-100
                           Sacramento, CA 95814-7306
17
     For the Defendant:    DAVID W. DRATMAN, ATTORNEY AT LAW
18                         1007 7th Street, Suite 305
                           Sacramento, CA 95814
19
                           JESSE S. ORTIZ, III, ATTORNEY AT LAW
20                         ORTIZ LAW OFFICE
                           717 K Street, Suite 418
21                         Sacramento, CA 95814

22

23

24   Reported by:  VICKI L. BRITT, RPR, CSR No. 13170

25

1          JANUARY 29, 2010 AT THE HOUR OF 10:00 A.M.

2          BEFORE THE HONORABLE EDWARD J. GARCIA

3                        ---oOo---

4          THE CLERK:  Criminal S-06-331, United States

5     versus David John Carli.

6          MR. STEGMAN:  Good morning, your Honor.  Matthew

7     Stegman for the United States.

8          THE COURT:  Mr. Stegman.

9          MR. ORTIZ:  Good morning, your Honor.  Jesse Ortiz

10    appearing for Mr. Carli, who is present, in custody.

11         THE COURT:  Mr. Ortiz.

12         MR. DRATMAN:  And good morning, again, your Honor.

13    David W. Dratman with Mr. Carli as well.

14         THE COURT:  Mr. Dratman.

15         Give me just a minute, please.

16         This matter is on the calendar for a hearing on

17    defendant's motions to suppress and for trial confirmation

18    hearing, I think.  The jury trial is scheduled to commence

19    in this case on February 23, 2010, at 9:00 a.m.  Am I

20    correct as far as the trial date is concerned?

21         MR. ORTIZ:  Yes, your Honor.

22         THE COURT:  And the trial confirmation hearing?

23         MR. ORTIZ:  Yes.

24         MR. STEGMAN:  My understanding is the trial

25    confirmation hearing is one week from today.  It gives us

1   time to resolve these issues.

2              THE COURT:   What's the TCH date then?

3              THE CLERK:   February 5.

4              THE COURT:   I've notified -- I had the clerk

5   notify counsel that we would not be hearing witnesses today

6   on the requested *Franks* motion by the defense, and I think

7   the Government agreed that possibly a *Franks* hearing was

8   necessary to decide at least one of the search warrants; is

9   that correct?

10             MR. STEGMAN:   That's correct, your Honor.   The

11  2004 search warrant.

12             THE COURT:   Right.   So that what I decided to do

13  is to handle as many of the legal issues as we could today,

14  which would be in totem the motions to suppress on the first

15  three search warrants.   I'm prepared to hear argument and

16  decide those.   And then I may ask some questions about legal

17  issues that would come up on that fourth search warrant.

18             As I understand the posture of the case, the fifth

19  search warrant issued by the district's magistrate judge is

20  tied to the other four.   If any of the other four fall, the

21  last search warrant would fall also, probably, am I right?

22             MR. ORTIZ:   That's our position, Judge.

23             THE COURT:   At least if the fourth search warrant

24  fell.   Because I understand, the defense search warrant is

25  just to inspect the computers and stuff that was seized on

```
 1   that fourth search warrant.
 2          MR. STEGMAN:  The federal search warrant is only
 3   for the computer that was ceased based on the 2004 search
 4   warrant.
 5          THE COURT:  That's what I understand.  You can see
 6   why I may be a little, somewhat confused on the two cases on
 7   the same date, with voluminous paperwork.
 8          Now, as to search number 2161, I'm prepared to --
 9   I've reviewed the briefs on that matter.  I'll hear brief
10   argument, if counsel wish, and I'm prepared to rule.
11          Do you wish to be heard further on the motion to
12   suppress on that case, Mr. Ortiz?
13          MR. ORTIZ:  Yes, just briefly, Judge.  Thank you.
14   Our position is that the Warrant 2161 was improperly issued,
15   as it was not supported by probable cause.
16          THE COURT:  Well, I know that.  That's why you
17   filed a motion.  Is there something you want to tell me
18   about or emphasize that's not covered in your paperwork?
19          MR. ORTIZ:  Nothing in addition to what's in the
20   paperwork.
21          THE COURT:  If you submit the matter, Mr. Stegman,
22   I'm going to deny the motion for that first search warrant.
23          MR. STEGMAN:  So submitted, your Honor.
24          THE COURT:  Let me read my notes into the record.
25          On September 18, 2002, Nevada County law
```

1  enforcement conducted a marijuana overflight of an area near

2  Crooked Arrow Lane and Carli Lane in this district.  Based

3  on Nevada County Sheriff's Deputy James Casci's -- is that

4  the way you pronounce that?

5       MR. STEGMAN:  I believe it's Casci.

6       THE COURT:  -- Casci's observations of vegetation

7  under cultivation, with a distinct fluorescent shimmering

8  green color, as well as his experience and training, he

9  filed a petition and affidavit for a search warrant for the

10  surrounding area for marijuana and related items.

11       A warrant was issued on the morning of

12  September 27, 2002, authorizing the search of the area,

13  including a mobile home and surrounding outbuildings and

14  vehicles and persons in control of the marijuana grow.  The

15  search resulted in the seizure of marijuana plants and a

16  roll of film.

17       Defendant contests the warrant and the seizure,

18  alleging insufficient probable cause.  The defendant's

19  motion to suppress the results of this warrant, No. 2161, is

20  now denied.

21       As the 1986 Supreme Court *Ciraolo* case and Ninth

22  Circuit *Broadhurst* cases cited by the Government point out,

23  there is no reasonable expectation of privacy, and, thus, no

24  Fourth Amendment violation, in what can be plainly viewed

25  from the air, even when the observer is trained to recognize

1  marijuana and is making a focused observation, instead of
2  just a routine patrol.  In addition, probable cause can be
3  based solely on a trained law enforcement officer's
4  observations.
5      Next I'll take up Warrant No. 2163.  Is there
6  anything you want to add on that one, Mr. Ortiz, not cited
7  in your briefs?
8      MR. ORTIZ:  I just want to point out, Judge, that
9  in support of this, the Court granted this warrant based on
10 only the finding of one additional plant, three harvested
11 plants, and a locked, bolted door.  Based only on that
12 information, the Court authorized the search for indicia of
13 sales of marijuana and cultivation in excess of what is
14 allowed under the California prescription marijuana act.
15 That's not what it's called, but that body of law.
16     We submit to the Court that that was not
17 sufficient to allow the warrant to issue in relation to the
18 indicia of sales, going into that locked room, and we submit
19 that that should be suppressed.
20     THE COURT:  All right.  Mr. Stegman, if you submit
21 this matter, I'm going to deny the motion to suppress on
22 that warrant.
23     MR. STEGMAN:  Submitted.
24     THE COURT:  In Warrant No. 2163, immediately
25 following the first search, the officers went to 430 Zion

1   Street, the home of the property owner, Daniel Carli, and
2   spoke with his brother, Defendant David Carli.   Defendant
3   gave the officers permission to search the exterior yard
4   area of the home.

5          In the yard, Deputy Casci observed marijuana
6   plants, both being cultivated and previously harvested.   He
7   also found a locked basement.  Based on this information, as
8   well as his experience and expertise, he sought a second
9   rollover warrant on the afternoon of September 27, 2002, to
10  search the inside of the Zion Street residence, including
11  that locked basement.  The affidavit in support of the
12  warrant was oral and was subscribed to the judge from whom
13  the warrant was sought.

14         The affidavit described the results of the first
15  search, 70 marijuana plants, seven medical marijuana
16  prescriptions, some valid and some expired, and the
17  officer's observations and findings while at the Zion Street
18  address.

19         Based on this information, Superior Court Judge
20  Darlington, the same judge who issued the first warrant,
21  issued Warrant No. 2163, finding probable cause to believe
22  marijuana is being cultivated within the residence and
23  outbuildings, and that harvested marijuana could be found in
24  amounts exceeding those necessary for persons having a
25  prescription under California's Proposition 215.

1          Defendant objects to this warrant, contending it
2    lacked probable cause that the specified evidence, that is
3    the marijuana for sale, indicia, and marijuana sales, photos
4    of marijuana, and of people with marijuana would be found.
5    The motion to suppress is denied for Search Warrant No.
6    2163.

7          In his motion, defendant omits or overlooks
8    numerous pieces of additional information contained in the
9    oral affidavit.  First, defendant's denial to the officer
10   that he was growing marijuana in the Zion Street location;
11   second, defendant's apparent confusion about the quantity of
12   marijuana he could possess with a medicinal marijuana
13   prescription; third, photos found during execution of the
14   first search warrant of marijuana plants under cultivation
15   at a location other than the Crooked Lane property; fourth,
16   the officer's testimony that his observations, combined with
17   his knowledge and experience, led him to believe either
18   cultivation or sales were taking place at the Zion Street
19   residence.

20         Based on all of this information, the officer
21   sought and received permission to search the house,
22   outbuildings, vehicles, and persons for evidence of
23   cultivation, harvesting, packing and weighing.

24         As the California Supreme Court *Mower* case and
25   Third District Court of Appeal *Fisher* case, cited by the

1   Government, they teach possession of medicinal marijuana

2   prescription provides a holder no immunity from arrest or

3   search.  A claim of legal possession of marijuana, based on

4   Proposition 215, is, at best, an affirmative defense, not a

5   free pass to fly under the radar of law enforcement.

6           Based on the foregoing, probable cause existed for

7   issuance of Warrant No. 2163 to search the Zion Street

8   residence, its outbuildings, and the locked basement for

9   evidence of marijuana cultivation and an indicia of sale.

10          Also, during the execution of this search warrant,

11  law enforcement officers observed in plain view photographs

12  and drawings of what appeared to be child pornography.

13  Defendant objects to the observations, calling them an

14  unreasonable search and seizure, based beyond the parameters

15  of the warrant and in violation of the Fourth Amendment.  He

16  seeks exclusion of the pictures on these grounds.  That

17  portion of defendant's motion is also denied.

18          It's Hornbook Law, that when officers are lawfully

19  in a location, where they have a right to be, they may seize

20  items observed in plain view, which they have probable cause

21  to believe are contraband or evidence of a crime.  In that

22  connection, see Coolidge v. New Hampshire and Arizona v.

23  Hicks, U.S. Supreme Court cases cited by the Government.

24          This warrant authorized seizure of photographs

25  depicting marijuana and persons with marijuana.  In order to

1   determine if any photograph found in the residence fell

2   within the scope of the warrant, the officers had to examine

3   them.  During the examination, they saw what appeared to

4   them to be child pornography.  They contacted Sergeant Gage,

5   Nevada City police officer, who went to the residence and

6   observed the photographs and drawings.  Based on his

7   expertise and experience, he determined the photos and

8   drawings appeared to be of child pornography involving

9   minors.  Thus, under the plain view doctrine, that seizure

10  was appropriate.

11         Going on then to Warrant No. 3164.  I've reviewed

12  the briefs on that matter, and I'm prepared to rule.  Is

13  there anything you want to add or emphasize on that search

14  warrant motion, Mr. Ortiz?

15         MR. ORTIZ:  Yes, your Honor, thank you.  As it

16  relates to the inclusion of Mr. Carli, David Carli'S

17  bedroom, our position is that the warrant and the affidavit

18  that were submitted by the officers, to the Court, lacked

19  any information for the Court to be able to tailor the

20  warrant, so that no one, Mr. Carli or anybody's rights were

21  violated under the Fourth Amendment.

22         There's no indication at all as to where the

23  photos that were found in plain view were found, whether

24  they were found in the common area of the house, whether

25  they were found in Daniel Carli's bedroom, which is

```
 1   information that's necessary.  Because if they were found in
 2   Daniel Carli's bedroom, then the Court could not or should
 3   not have allowed a search of David Carli's bedroom.  And for
 4   that reason, and because of the failure to include that
 5   information, the warrant should not have been issued
 6              THE COURT:  Very well.  If you submit this motion,
 7   I intend to deny it, Mr. Stegman.
 8              MR. STEGMAN:  Your Honor, submitted.
 9              THE COURT:  As to Warrant No. 2164, based on their
10   observations of photographs and drawings of what appeared to
11   be child pornography during the execution of the second
12   search warrant, the officers sought at 7:00 p.m.,
13   December 22, 2002, another rollover warrant for a search of
14   evidence of the scene.  The affidavit in support of this
15   warrant was oral, and it was made to the same judge who had
16   authorized the first two warrants.
17              In the affidavit, Sergeant Gage described his
18   tenure as a police officer, his observations when called to
19   the Zion Street residence in the afternoon, and his belief
20   that other evidence of child pornography would be present in
21   the house.  The warrant authorized a search of the entire
22   house, including defendant's bedroom.  It also authorizes
23   seizure of any computers.
24              Defendant objects, contending that the search
25   warrant was issued after the seizure occurred and was only
```

1   issued to justify the search.  In addition, defendant argues
2   that Sergeant Gage's information was not based wholly on
3   personal knowledge.  Specifically, defendant asserts that
4   because no information was provided to the judge concerning
5   the location of the photographs, and hand drawings, a
6   warrant authorizing a search of the entire residence,
7   including defendant's bedroom, was overbroad.  The motion to
8   suppress this search warrant is denied.

9         First of all, the items of child pornography
10  seized pursuant to the second warrant were taken pursuant to
11  the plain view doctrine as discussed above.  No additional
12  justification was needed for their seizure.

13        Second, as the oral affidavit makes it clear,
14  Sergeant Gage, the affiant, did see the photographs and
15  drawings prior to seeking the third warrant.  And the judge
16  confirmed that the affiant had a personal knowledge.

17        Finally, as the Government notes in his opposition
18  brief, search of defendant's bedroom was appropriate.  The
19  warrant authorized a search of the entire residence,
20  including all areas under the control of both defendant and
21  his brother.  Accordingly, defendant's motion to suppress
22  the results of this warrant is also denied.

23        Now, it's Warrant No. 2353, is it not, that we're
24  going to schedule for a hearing of witnesses?
25        MR. DRATMAN:  Yes, your Honor.

1           MR. STEGMAN:  Yes.

2           THE COURT:  First of all, what I'd like to know,

3    how many witnesses do counsel anticipate would come?  And I

4    know sometimes these things are fluid and that other

5    witnesses may be called because of testimony that's given.

6           MR. STEGMAN:  The Government would plan on calling

7    Officer Dan Badour, who's present today, and also calling

8    Ben Baszler, since a couple of allegations are whether or

9    not any threats or promises were made to him.  I expect, and

10   it's hard to estimate, but I expect Dan Badour's testimony

11   might be about an hour long.

12          MR. DRATMAN:  It would be longer probably.  I

13   would say that his testimony could be rather extensive, as

14   could Mr. Baszler's.

15          THE COURT:  Okay.  In fact, what I'm thinking of

16   doing is special setting the matter, other than the law and

17   motion calendar, so that I can devote all day to the case if

18   it's necessary.

19          MR. DRATMAN:  I just thought of this and hadn't

20   talked to counsel about this.  We have a trial date looming.

21   And, quite frankly, I think all of us, at least on the

22   defense side, we need to know the outcome of this before

23   going to trial.

24          THE COURT:  I understand.

25          MR. DRATMAN:  We already have the time scheduled

```
 1   for February 23, and I had not talked to Colleen about this
 2   at all, but that might be a week to do it.
 3            THE COURT:  Well, as you can see, I've read
 4   everything in the case, including your briefs, and I'll hear
 5   the testimony, and as my usual custom is, I'll rule from the
 6   bench.  Keep that in mind.  I don't take those matters under
 7   submission.
 8            THE CLERK:  If we're going to do that, February 23
 9   is a Tuesday.  How about February 22?  Because we are going
10   to have to move the trial to the 22nd anyway, a Monday.
11            THE COURT:  That's moving pretty fast.  They've
12   got a right to at least try to digest my suggestion.
13            THE CLERK:  Well, Mr. Dratman suggested
14   February 23.
15            MR. DRATMAN:  As the date for the hearing and
16   vacating the trial date and then figuring out a new trial.
17            THE COURT:  If counsel are willing to do that, I
18   think that's the best thing to do, is to postpone the trial
19   date for a shorter period as we can, to get this motion out
20   of the way.  My experience has been that, at least in
21   pornography cases, these motions settle the cases.
22            MR. DRATMAN:  We could either be here on the 22nd
23   or 23rd, but the 23rd and 24th should do it.  At least we
24   now know we don't have to bring in Mr. Baszler, so we will
25   not be issuing a subpoena and serving a subpoena on him,
```

```
1    unless the Government wants us to do so.

2               MR. STEGMAN:  Well, I plan on having Ben Baszler

3    present as a Government witness.

4               THE COURT:  Okay.  Then you'll be excused from

5    issuing a subpoena for him, Mr. Dratman.

6               MR. DRATMAN:  We will be bringing in his mother.

7    There is an investigator that's involved from our

8    standpoint, and we're still determining whether or not any

9    other witnesses relate to -- what other witnesses we're

10   going to be bringing.  But Mr. Baszler and Mr. Bedore and

11   Mr. Baszler's mother may take some time, as well as the

12   investigator that's interviewed both of them.  I think the

13   Court, if there is a contradiction, the Court may want to

14   hear it.

15               In addition, I'm going to be ordering -- actually,

16   I don't need to tell the Court this now.

17               THE COURT:  Don't tell me anything you don't want

18   me to hear, Mr. Dratman.

19               MR. DRATMAN:  I know how diligent this court is.

20   I'm not certain beyond those witnesses who we're going to be

21   having, but I think two days would be fair for it.

22               MR. STEGMAN:  One or two days, I would agree with

23   that.  Although I don't know if the Court thinks this is the

24   appropriate time or the morning of the hearing, but I think

25   that the mother, Ben Baszler's mother, that the defense
```

```
 1   plans on calling, I don't think is a relevant witness.  I
 2   would ask for an offer of proof, and I'd like to be able to
 3   argue whether or not -- her information, I don't know if the
 4   Court wants to hear me on that now?
 5           THE COURT:  Not now, but if you want to call her,
 6   Mr. Dratman, you ought to have her available.
 7           MR. DRATMAN:  We'll make sure that she's
 8   subpoenaed, and with an offer of proof, which we've already
 9   attached to our moving papers, but that's fine.  And we'll
10   also have investigator as well, whose declaration has been
11   attached as well.
12           Beyond that, I'm not certain, which is why, I
13   think it clearly could go beyond one day with these
14   witnesses.  But I'm known to, my estimations are no good,
15   even after all these years.
16           THE COURT:  Okay, you're talking about Tuesday and
17   Wednesday, February 23 and 24?
18           MR. DRATMAN:  Yes, your Honor.
19           THE CLERK:  Excuse me.  I thought you were talking
20   about February 22 and 23?
21           MR. DRATMAN:  Whichever one is convenient to the
22   Court.  I mean we have February 23, which is already
23   scheduled.
24           MR. STEGMAN:  Although the Court was going to move
25   us to February 22 apparently.  So I would suggest
```

```
1   February 22 and 23.

2            MR. DRATMAN:  That's fine.

3            THE COURT:  Okay.  And that will be at 9:00 a.m.

4            MR. DRATMAN:  My suggestion would be to the Court,

5    and to counsel, that for purposes of attorney preparation

6    and for case complexity, that the Court find excludable time

7    under T2 and T4, and also for the pending motions, and that

8    we vacate the trial date and see where we are.

9            MR. STEGMAN:  And I would agree with all of that.

10           THE COURT:  All right, that request will be

11   granted.  We'll find excludable time under T2 and T4 to the

12   status conference, which was scheduled to trail the

13   evidentiary hearing.

14           MR. DRATMAN:  I would also suggest to the Court

15   that we vacate the February 5 date.  I think we're on that

16   date.  And so that would be unnecessary until the motion is

17   actually heard.

18           THE COURT:  What's the February 5 date?

19           MR. DRATMAN:  I didn't even have it in my

20   calendar.

21           THE CLERK:  It's trial confirmation.

22           THE COURT:  Okay, that will be cancelled.  The

23   present trial date will be vacated, along with this trial

24   confirmation hearing, and we'll find excludable time up to

25   February 24, and schedule the status conference on that
```

```
 1   date, okay?
 2              MR. DRATMAN:  Very well, your Honor.
 3              THE CLERK:  February you said?
 4              THE COURT:  February 22 and 23.
 5              MR. STEGMAN:  Thank you, your Honor.
 6              THE COURT:  Thank you, counsel.
 7              We're still on the record.
 8              MR. DRATMAN:  I think they've taken our client
 9   downstairs.  We can waive his appearance.
10              THE COURT:  Okay, I don't think it's necessary.
11              MR. DRATMAN:  We'll waive his appearance then.
12              THE MARSHAL:  He's still here.  Just one moment.
13              THE COURT:  There was something rather confusing
14   in the written declaration in support of this search warrant
15   that we're talking about.  As I recall, the officer said he
16   ran a rap sheet on Baszler?
17              MR. DRATMAN:  Yes, he did, your Honor.  That's at
18   --
19              THE COURT:  Excuse me.  Not Baszler.  I know he
20   did that.  He found out he wasn't a good boy.  No, I'm
21   talking about the defendant.  He ran a rap sheet on the
22   defendant apparently, and found out that -- he states in the
23   written portion of the search warrant affidavit that the
24   defendant was on summary probation.  Now, I was a state
25   judge for 10 years.  There ain't no such thing as summary
```

```
1    probation in superior court on a felony crime, but I've
2    never been in Nevada County.
3              MR. STEGMAN:  It was a misdemeanor, your Honor.
4    The defendant, both defendants, David and Dan Carli, plead
5    to misdemeanors.
6              THE COURT:  What was the misdemeanor?
7              MR. STEGMAN:  I believe it was marijuana
8    cultivation.
9              MR. DRATMAN:  Actually, it was not.  Your Honor,
10   it's not set forth in -- that's one of the -- it's at page
11   15 of the written declaration, which is page 21 of 75 in our
12   Exhibit D, and it's lines 11 through 16, I believe the Court
13   is referring to.  "Your affiant conducted a criminal history
14   check with the California Department of Justice on David
15   John Carli, date of birth, which revealed an arrest in 2002
16   for 11358 H&S, plant/cultivate/etc./marijuana/hashish, and
17   11359 H&S, possession of marijuana for sale.  Receiving a
18   misdemeanor conviction and was sentenced to 36 months in
19   jail."
20             THE COURT:  Okay, hold it there just a minute.  I
21   haven't been over in state court for 25 years.  Those aren't
22   wobblers.
23             MR. DRATMAN:  They are not.
24             THE COURT:  A judge could not make them
25   misdemeanors if he plead out to either one of those two.
```

1           MR. DRATMAN:  That is correct.

2           THE COURT:  Now, let's take it one step at a time.

3    Secondly, I've never seen a summary probation in a state

4    court that has a search and seizure tail on it.  Because

5    summary probation, by definition, is something that's not

6    referred to a probation officer.  So there's no supervision.

7           Anyway, I just wanted to bring that to your

8    attention.  That confuses me because it raises an important

9    legal issue.  If there was a search and seizure tail on this

10   defendant, maybe no warrant was needed at all on this search

11   covered by Search Warrant No. 4, or the one we're talking

12   about.  I know that whatever that officer wrote or told the

13   judge cannot be changed today, but it confused me when I

14   read it.

15          MR. STEGMAN:  Should I give the Court my thoughts

16   on that?

17          THE COURT:  Sure, you can correct me if you want.

18          MR. STEGMAN:  Well, two things.  One is, I believe

19   that the defendant plead guilty, he and his brother both

20   plead guilty to misdemeanor counts of possession of more

21   than an ounce of marijuana.

22          THE COURT:  Okay.  What we used to call mere

23   possession.

24          MR. STEGMAN:  Correct.  And the second point was,

25   although I'd like to be able to rely on the probation

```
1   search, I believe the law would have required the probation
2   officer to have been present and to have been directing the
3   search, and I don't think that was the case here.
4           THE COURT:  That brings up the question, I'd like
5   to see the transcript of the grant of summary probation
6   because that would set the parameters of who can search and
7   who can't and why.
8           MR. STEGMAN:  And I have that.
9           THE COURT:  Okay.  Because as I recall, acceptance
10  of summary probation is a full waiver of search and seizure,
11  Fourth Amendment rights.
12          MR. STEGMAN:  And what I'd like to do is brief
13  that to the Court, and I will have the transcripts.
14          THE COURT:  I just wanted to bring that to your
15  attention because it did confuse me.  That's what happens
16  when a state judge comes over to federal court.
17          Thank you, Counsel.
18          (Whereupon, Court adjourned at 11:45 a.m.)
19
20
21
22
23
24
25
```

1        CERTIFICATE OF SHORTHAND REPORTER

2

3            I, VICKI L. BRITT, a Certified Shorthand Reporter,

4    of the State of California, do hereby certify that I am a

5    disinterested person herein; that I reported the foregoing

6    proceedings in shorthand writing; that I thereafter caused

7    my shorthand writing to be transcribed into typewriting.

8            I further certify that I am not of counsel of

9    attorney for any of the parties to said proceedings, or in

10   any way interested in the outcome of said proceeding.

11           IN WITNESS THEREOF, I have hereunto set my hand

12   this December 5, 2010.

13

14           /s/Vicki L. Britt_____
             VICKI L. BRITT, RPR, CSR No. 13170
15

16

17

18

19

20

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3
                              ---o0o---
4
     UNITED STATES OF AMERICA,
5
                        PLAINTIFF,
6
     v.                                  NO. 2:06-cr-331-EJG
7
     DAVID JOHN CARLI,
8
                        DEFENDANT.
9    _____/

10
          BEFORE THE HONORABLE EDWARD J. GARCIA, SENIOR UNITED
11   STATES DISTRICT JUDGE, EASTERN DISTRICT OF CALIFORNIA, AND
     ON FRIDAY, NOVEMBER 19, 2010.
12
          REPORTER'S TRANSCRIPT OF MOTION TO SUPPRESS
13
                          APPEARANCES:
14
     FOR THE UNITED STATES:        MATTHEW C. STEGMAN
15                                 LEAD ATTORNEY
                                   U.S. ATTORNEY'S OFFICE
16                                 501 I STREET, Ste. 10-100
                                   SACRAMENTO, CA 95814-2322
17                                 (916) 554-2793

18   FOR THE DEFENDANT:            DAVID W. DRATMAN
                                   ATTORNEY AT LAW
19                                 1007 7TH ST., STE. 305
                                   SACRAMENTO, CA 95814
20                                 (916) 443-2000

21        Reported by:   Julie Stinnett, CSR No. 11578

22

23

24

25

26

27

28

```
 1                    SACRAMENTO, CALIFORNIA
 2              FRIDAY, NOVEMBER 19, 2010, AT 2:00 P.M.
 3                        COURTROOM 8
 4          HON. EDWARD J. GARCIA, SENIOR U.S. DISTRICT JUDGE
 5                         ---o0o---
 6              COURTROOM DEPUTY:  All rise.  Court is now in
 7    session.
 8              You may be seated.
 9              Case cr-s-06-331, United States versus David John
10    Carli.
11              MR. STEGMAN:  Matthew --
12              THE COURT:  The record will show all the proper
13    parties are again before the Court.  The matter is on
14    calendar for continued hearing on defendant's Franks motion
15    in connection with defendant's motion to suppress.
16              Let's see.  At the last hearing session, after
17    interrupting Sergeant Badour's testimony, we heard three
18    more defense witnesses out of order at defendant's request.
19    We completed that testimony of defendant's former attorney,
20    Stephen Munkelt, Pamela Harvey, Ben Baszler's mother, and
21    Donald Criswell, a defense investigator.
22              We're now convened to hear the balance of Witness
23    Sergeant Badour's testimony.
24              Is he present?
25              SERGEANT BADOUR:  Yes, Your Honor.
26              THE COURT:  You want to resume the stand please,
27    Sergeant.
28                    SERGEANT DAN BADOUR, RECALLED
```

```
1              THE COURT:  You want to proceed, Mr. Dratman?
2              MR. DRATMAN:  Yes.  Thank you, Your Honor.
3                    DIRECT EXAMINATION, CONTINUED
4    Q.    Sergeant Badour, I have a transcript of where we
5    left off on May 18, 2010.
6          By the way, how did your surgery go?
7    A.    Very well.  Thank you.
8    Q.    Good.
9          And the last question that you were asked was,
10   (reading) Did you take Mr. Baszler before the judge before
11   you brought the affidavit in, or did you bring the
12   affidavit in and then bring Mr. Baszler in to Judge
13   Tamietti?
14         And your answer was, (reading) No.  The affidavit
15   was not brought in before he was deemed credible.  The
16   affidavit was based on his being deemed credible.
17         Do you remember that?
18   A.    I do.
19   Q.    Okay.  This process of having Mr. Baszler deemed
20   credible by Judge Tamietti, it started with your bringing
21   Mr. -- first of all, how did Mr. Baszler get to see Judge
22   Tamietti?
23         MR. DRATMAN:  I'm getting a little bit of a reverb
24   up here, and I don't have a cell phone or anything else.
25   I'm not sure if I'm too loud for this or if there is a way
26   to adjust it.
27         Can you hear me okay?
28         THE WITNESS:  Yes.
```

```
 1              THE COURT:  Your Honor, can you hear me okay?
 2              Okay.  I don't want to echo.
 3    Q.       MR. DRATMAN:  The processes of bringing Baszler
 4    before Judge Tamietti, how did that occur?
 5    A.       That was a request that was made by myself to the
 6    district attorney's office.
 7    Q.       And who did you make that request to in the
 8    district attorney's office?
 9              Would that have been Ron Wolfson, the person that
10    testified -- well, Ron Wolfson, the Assistant District
11    Attorney, who had reviewed your search warrant affidavit
12    and who signed off on it?
13    A.       I don't remember if he was the first district
14    attorney that I requested that of, but he was involved.
15    Q.       And what you did was -- in fact, you do remember
16    that he was the district attorney who reviewed the search
17    warrant affidavit, correct?
18    A.       I'm not sure.
19              MR. DRATMAN:  Your Honor, may I approach the
20    witness?
21              THE COURT:  You don't have to ask for permission
22    when the reason is obvious, Mr. Dratman.
23              MR. DRATMAN:  Your Honor, I wanted to ask the one
24    time.  Thank you very much.
25    Q.       MR. DRATMAN:  I'm going to show you what's in
26    evidence Government's Exhibit 2.
27              Do you recognize that as being the search
28    warrant affidavit and search warrant, which includes the
```

1    transcript of the tape-recorded conversation --
2    tape-recorded testimony relating to the search warrant that
3    issued on November 2nd, 2004?
4    A.        Yeah.
5    Q.        And do you see there where it says, "Reviewed by
6    Ronald Wolfson, District Attorney"?
7    A.        Yes.
8    Q.        And it was Ronald Wolfson who reviewed this search
9    warrant, correct?
10   A.        Correct.
11   Q.        And it was -- was it Ronald Wolfson that you
12   discussed this procedure with --
13   A.        Yes.
14   Q.        -- concerning Mr. Baszler?
15   A.        Yes.
16   Q.        And you asked Mr. Wolfson to arrange to have Mr.
17   Baszler brought before Judge Tamietti so that he could be
18   placed under oath and examined by Judge Tamietti?
19   A.        Correct.
20   Q.        And your prior testimony that you were doing that
21   to have him deemed credible; that is Mr. Baszler deemed
22   credible?
23   A.        Yes.
24   Q.        Mr. Baszler was to you someone who was not a
25   citizen informant, correct?
26            He was not just a citizen coming in off the street
27   and giving information, correct?
28   A.        Correct.

1   Q.     In fact, he had serious credibility problems that

2   you observed, correct?

3   A.     Yes.

4   Q.     He was on probation for a felony offense, correct?

5   A.     Yes, I believe he was.

6   Q.     And in addition to being on probation for a felony

7   offense, you yourself had arrested him for new felonies

8   while on probation, correct?

9   A.     Correct.

10   Q.     He had a pending probation violation that had been

11   filed by the Nevada County Probation Department, as well,

12   correct?

13   A.     I believe he had.

14   Q.     An he was someone that when you met him, within a

15   short time of you meeting him, he actually lied to you

16   about his even knowing the victim in the case you arrested

17   him about, correct?

18   A.     Yes.

19   Q.     So you -- and did you have information about him

20   that he had lied on other occasions, that is Mr. Baszler?

21   A.     Yes.

22   Q.     And where did you receive that information from,

23   about Mr. Baszler lying on other occasions?

24   A.     Well, he had been arrested previously.

25   Q.     You actually had 21 contacts that you referred to

26   in your search warrant affidavit of contacts with Mr.

27   Baszler indicating that he was pretty much a criminal;

28   would you agree with that?

```
1   A.      Yes.
2   Q.      And that he was someone who could not be trusted,
3   correct?
4   A.      Correct.
5   Q.      He was someone that would lie for his own
6   advantage, correct?
7   A.      Yes.
8   Q.      And you knew this when you drafted this affidavit
9   in support of the search warrant for Mr. Carli, correct?
10  A.      Yes.
11  Q.      And you wanted the judge to have an opportunity to
12  see Mr. Baszler himself, correct?
13  A.      Yes.
14  Q.      And you had done this procedure before, as you
15  testified, correct?
16  A.      Yes.
17  Q.      And when you examined Mr. Baszler in front of
18  Judge Tamietti, did you bring out with Mr. Baszler all the
19  things that you just told the Court about Mr. Baszler?
20          MR. STEGMAN:   Objection, Your Honor.  The -- the
21  search warrant affidavit speaks for itself.
22          THE COURT:  Overruled.
23  Q.      MR. DRATMAN:  Let met be specific.
24          Did you ask Mr. Baszler if he was what you knew
25  him to be, that is, a liar in the past?
26  A.      I didn't question him during the credibility
27  hearing.  The district attorney and the judge did.
28  Q.      In fact, you did question him -- you were the
```

1  person that actually questioned him throughout that
2  hearing; isn't that the truth?
3  A.      I don't remember questioning him at all in that
4  hearing.
5          MR. DRATMAN:  I'm going to direct your attention
6  to Exhibit 2 that's in front of you.  There is a transcript
7  on Exhibit 2 that's admitted into evidence.
8          Look at page three of that.  It's numbered 234.
9          I believe the Court has a courtesy copy.  I hope
10 the Court does.  If not, I have an extra copy.
11         This is Exhibit -- Government's Exhibit 2.  I
12 believe multiple copies were provided.
13 Q.      MR. DRATMAN:  Is that Exhibit 2, the search
14 warrant affidavit?
15         If I could direct you -- let me show you.
16         Right here, page three of that attachment, on the
17 lower right-hand side, it says, 0234.
18         Do you see that?
19 A.      Yes.
20 Q.      And, in fact, you see where on that page at line
21 18 that Benjamin Baszler is called as a witness in this
22 matter, correct?
23 A.      Yes.
24 Q.      And you see where it starts "Examination"?
25 A.      Yes.
26 Q.      Your name, "Officer Badour," appears there,
27 correct?
28 A.      Yes.

```
 1    Q.       And, in fact, are you the person that acts --
 2    excuse me -- asks the Witness Baszler the questions that
 3    begin this examination?  Isn't that correct?
 4    A.       Yes.
 5    Q.       And throughout this there is no -- you are aware
 6    also that Mr. Wolfson, the deputy district attorney, was
 7    present, correct?
 8    A.       Yes.
 9    Q.       He didn't ask any questions of Mr. Baszler; isn't
10    that true?
11    A.       I don't remember.
12    Q.       You were the person that was asking Mr. Baszler
13    questions, interrupted at times by -- in part, the Court
14    asked a few questions.
15             Do you remember that?
16    A.       I remember the Court asking questions.
17    Q.       Now you do see that you were the one actually that
18    began the questioning and asked questions throughout this
19    transcript, correct?
20    A.       Yes.
21    Q.       And in asking those questions, did you cause Mr.
22    Baszler to disclose that he had lied to you?
23    A.       I don't remember.
24    Q.       You do -- you do -- you have read this transcript
25    in the past, correct?
26             Well, you were present when the questions that you
27    asked of Mr. Baszler were asked and when he gave those
28    answers, correct?
```

1   A.      Yes.

2   Q.      You were present when the Court asked some

3   questions of Mr. Baszler, correct?

4   A.      Yes.

5   Q.      And do you remember any time your -- your asking

6   Mr. Baszler to disclose to the Court what it was that he

7   was, in fact, in custody for?

8   A.      No, I don't recall.

9   Q.      As a matter of fact, wasn't your whole strategy

10  with Judge Tamietti not to discuss anything about Mr.

11  Baszler's background that would show that he was a liar and

12  somebody not to be believed?

13  A.      No, it wasn't my strategy.

14  Q.      Isn't that, in fact, how you started out your

15  examination of Mr. Baszler at page three, lines 22 and 24,

16  (reading) Mr. Baszler, as we talked before, basically we're

17  here not to talk about any of your upcoming charges.

18          Isn't that how you started this whole

19  interrogation in front of Judge Tamietti out?

20  A.      Yes.

21  Q.      In fact, there is nowhere in this transcript where

22  you discuss or ask questions of Mr. Baszler about the

23  reasons why he's in jail, correct?

24  A.      My understanding would be that that could be

25  incriminating to him.

26  Q.      Well, this was a person that you were putting in

27  front of a judge to have him deemed credible, correct?

28  A.      Yes.

1    Q.      Without -- by concealing from the judge all of
2    those things that you knew made him not to be credible;
3    isn't that true?  Isn't that what happened?
4    A.      No.
5    Q.      Did you, in fact, not ask Mr. Baszler one question
6    about his charges?
7    A.      You are talking about during this --
8    Q.      During this -- during the time that you were
9    trying to establish his credibility.
10   A.      No, that's not true.
11   Q.      You didn't ask Mr. Baszler one question about the
12   charges that he was facing in front of Judge Tamietti?
13   A.      No, I did not.
14   Q.      In fact, you made an effort not to discuss
15   anything in front of Judge Tamietti that would in any way
16   show that Mr. Baszler should not be believed; isn't that
17   true?
18   A.      It wasn't my job to show the judge whether or not
19   he could be believed.  That was for the judge to decide.
20   Q.      You controlled the examination of Mr. Baszler;
21   isn't that true?
22   A.      No, I don't believe that I controlled it.
23   Q.      You are the one that asked for Mr. Baszler to be
24   brought in front of Judge Tamietti for the purpose of
25   having him deemed credible?
26           THE COURT:  Mr. Dratman, you just keep repeating
27   the same questions because you don't like the answers.
28   That's why this case has been stretching on for years.

```
1              Get on to something else.  Ask another question.
2    You just asked the one you just reasked.
3    Q.        MR. DRATMAN:  When you asked Mr. --
4              THE COURT:  What you are doing is arguing with
5    your questions, and I don't like it.
6              MR. DRATMAN:  Your Honor, well, I will move on to
7    my next question, then.
8    Q.        MR. DRATMAN:  Is there any point in your
9    examination of Mr. Baszler where you disclose through Mr.
10   Baszler that he had lied to you directly?
11   A.        I don't believe that was discussed in the
12   evidentiary hearing.
13   Q.        And is there any point in -- where you ask Mr.
14   Baszler to disclose what he had done that got him in
15   contact with you?
16             Let me be more specific.
17             Did you ask Mr. Baszler to tell the Court that he
18   had had sexual intercourse as an adult with a 13-year-old
19   girl for several months?  Did you have him disclose that?
20   A.        No.
21   Q.        And you knew that's what he was before the Court
22   facing his own charges about, correct?
23   A.        That's what I arrested him for.
24   Q.        And you knew that because you had been briefed by
25   Officer Burke and you had read the declaration in support
26   of the arrest warrant, correct?
27   A.        Correct.
28   Q.        And just so that we're clear on that, showing you
```

12

```
 1    Exhibit K, this is a copy of the declaration in support of
 2    the arrest warrant together with the supporting incident
 3    report that details Mr. Baszler's crimes against Crystal
 4    T., correct?
 5    A.      Yes.
 6    Q.      And that report and the contents of that report
 7    was not discussed with Mr. Baszler in your effort to show
 8    that he was credible before Judge Tamietti, correct?
 9    A.      Correct.
10    Q.      You didn't bring out anything concerning what
11    Mr. Baszler had criminally done to Crystal T. in your
12    examination of him before Judge Tamietti, correct?
13    A.      Correct.
14    Q.      Now, in addition to -- in addition to not
15    discussing with Judge Tamietti --
16            THE COURT:  Don't preface your questions like
17    that, Mr. Dratman.
18            MR. DRATMAN:  You are right, Your Honor.  I'm
19    sorry.
20            THE COURT:  You are arguing your case with your
21    questions.  I'm not going to warn you again.
22            MR. DRATMAN:  I'm doing the best I can, Your
23    Honor.
24            THE COURT:  No, you are not.
25            MR. DRATMAN:  I'm trying to do the best I can.
26            THE COURT:  That you may be trying to do.
27            MR. DRATMAN:  Pardon me?
28            THE COURT:  Never mind.
```

1            Next question.  Just ask questions.  Don't argue
2    with the witness.
3    Q.    MR. DRATMAN:  You had discussions with Deputy
4    District Attorney Ronald Wolfson concerning Mr. Baszler's
5    probation violation before you brought Mr. Baszler before
6    Judge Tamietti, correct?
7    A.    Yes.
8    Q.    You were aware that Mr. Wolfson had appeared in
9    court with Mr. Baszler on Monday, November 1st, the day
10   before Mr. Baszler was brought in to see Judge Tamietti on
11   November 2nd, correct?
12   A.    I don't remember that.
13   Q.    Showing you to refresh your recollection
14   Defendant's Exhibit H.  That is a minute order that shows
15   that Ben Baszler was in court on a probation violation
16   before Judge Albert Dover, and the violation of probation
17   was one for the felony conviction that you were aware that
18   he had, and bail was set at $50,000.
19            Do you remember that?
20   A.    Yes.
21   Q.    And you were informed of that information by Mr.
22   Wolfson before you took Mr. Baszler to see Judge Tamietti,
23   correct?
24   A.    I'm not sure.
25   Q.    You were present during a -- another hearing that
26   occurred relating to these events that I believe is in a
27   transcript that's been marked as a government exhibit --
28   and I don't know that I took that.  Maybe I did.

```
 1              On May 19, 2005, as set forth in Government
 2    Exhibit 4, which is in evidence, there was a hearing on Mr.
 3    Carli's motion to suppress, correct?
 4    A.      Yes.
 5    Q.      And in that hearing, you were deemed to be -- you
 6    were appointed the investigating officer for the district
 7    attorney's office, correct?
 8    A.      Yes.
 9    Q.      And as the investigating -- excuse me.
10              As the investigator for the district attorney's
11    office, it was your right to be present during the
12    testimony of all the witnesses, correct?
13    A.      Yes.
14    Q.      And you were present during the testimony of
15    Deputy District Attorney Ron Wolfson, correct?
16    A.      Yes.
17    Q.      And during that testimony, Deputy District
18    Attorney Ronald Wolfson indicated that he had had more than
19    one conversation with you about the violation of probation
20    that had been filed against Mr. Baszler that was currently
21    keeping him in jail; isn't that correct?
22    A.      Yes.
23    Q.      Does that refresh your recollection as to whether
24    or not you had had conversations with Mr. Wolfson prior to
25    seeing Judge Tamietti about the violation of probation that
26    Mr. Baszler had?
27    A.      Yes.
28    Q.      And Mr. Wolfson and you had several conversations
```

1   prior to seeing Judge -- Judge Tamietti concerning the fact
2   that your witness, Mr. Baszler, was in custody on $50,000
3   bail for this violation of probation, correct?
4   A.      Yes.
5   Q.      And as a result of those conversations, efforts
6   had to be made by you to get Mr. Baszler out of custody,
7   correct?
8   A.      Yes.
9   Q.      And those efforts had to involve getting the
10  violation of probation dismissed, correct?
11  A.      Yes.
12  Q.      And Mr. Wolfson, at your request, agreed to
13  dismiss the violation of probation, correct?
14  A.      Yes.
15  Q.      And you were aware that that dismissal of the
16  violation of probation, in fact, occurred, correct?
17  A.      Yes.
18  Q.      You never told Judge Tamietti about any of your
19  conversations with Mr. Wolfson concerning this violation of
20  probation, did you?
21  A.      Not that I recall.
22  Q.      You never disclosed in your affidavit that you
23  knew that Mr. Baszler was in jail on a violation of
24  probation with a $50,000 bail to Judge Tamietti, correct?
25  A.      Not that I recall.
26  Q.      And you never disclosed to Judge Tamietti that you
27  had arranged with Deputy District Attorney Ron Wolfson to
28  have that violation of probation dismissed?

1          MR. STEGMAN:   Objection.  Assumes facts not in
2    evidence as to the timing.
3          THE COURT:  That's the question.
4          MR. DRATMAN:  That's the question.
5          THE COURT:  Overruled.
6          THE WITNESS:  Could you repeat the question.
7          MR. DRATMAN:  Your Honor, I don't typically do
8    this, but I'm a little off track.  Could I have the
9    reporter read it?
10         MR. DRATMAN:  Okay.
11         (Record read.)
12         THE WITNESS:  Not that I recall.
13   Q.     MR. DRATMAN:  You had the opportunity to disclose
14   the pending violation of probation in the affidavit that
15   you prepared that's in front of you as Government's -- I
16   believe it's Exhibit 1 -- did you not?  That is -- yes.
17   Government's Exhibit 2.  I apologize.
18         You had the opportunity to disclose to the Court
19   in that affidavit that Mr. Baszler was facing a violation
20   of probation and a $50,000 bail to Judge Tamietti, and you
21   didn't do so in that -- in that affidavit; isn't that
22   correct?
23   A.     Not that I recall.
24   Q.     And you had the opportunity to disclose to Judge
25   Tamietti that in the questioning of Mr. Baszler, that there
26   was a $50,000 bail on him based on the violation of
27   probation, and you didn't do that either, did you?
28   A.     No, not that I recall.

1    Q.       And Mr. Wolfson, who was present during the

2    examination of Mr. Baszler, did not disclose that he had

3    agreed to your request that the probation violation be

4    dismissed against Mr. Baszler; he didn't disclose that,

5    correct?

6    A.       I don't know.

7    Q.       You were present during the entire time that Mr.

8    Baszler was being examined, correct?

9    A.       Yes.

10   Q.       And you were present during the entire time that

11   Judge Tamietti was questioning all of the witnesses,

12   correct?

13            Strike that.  I'm going to strike that.

14            You were present during the entire time that

15   witnesses were in front of Judge Tamietti, correct?

16   A.       Yes.

17   Q.       At no time did you hear Mr. Wolfson ever say to

18   Judge Tamietti on the record that there was a pending

19   probation violation against Mr. Baszler; isn't that

20   correct?

21   A.       I don't remember.

22   Q.       But you do remember that you didn't disclose it?

23   A.       Yes.

24   Q.       Did you in your questioning of Mr. Baszler

25   disclose to Judge Tamietti that Mr. Baszler was, in fact,

26   on probation at all for anything?

27   A.       I don't remember.

28   Q.       Did you review the materials that you had prepared

1    in connection with the search warrant affidavit that are
2    contained in Exhibit 2 prior to your testimony?
3    A.      Yes.
4    Q.      Do you remember anything being in those materials
5    relating to that search warrant affidavit, including the
6    questioning of Mr. Baszler, that discloses that you had --
7    that shows that you had informed Judge Tamietti of the fact
8    that Baszler was on probation?
9    A.      Are you asking regarding when he was deemed
10   credible or are you asking about the affidavit for the
11   search warrant?
12   Q.      During the questioning of him; that is, the
13   questioning before Judge Tamietti only.
14   A.      I don't remember.
15   Q.      As I understand your testimony -- strike that.
16           Did you tell this Court that you put Mr. Baszler
17   before Judge Tamietti before you presented your search
18   warrant application to him; is that correct?
19   A.      Yes, I believe so.
20   Q.      That's what you -- that's what you testified to
21   earlier when you appeared before this Court, correct?
22   A.      I don't remember being asked that question before
23   this Court.
24   Q.      Actually, we started out this morning (sic) with
25   me asking you the last question that I asked you, which
26   was, (reading) Did you take Mr. Baszler before the judge
27   before you brought the affidavit in, or did you bring the
28   affidavit in and then bring Mr. Baszler in to Judge

1    Tamietti?

2            And you answered, (reading) No.  The affidavit was

3    not brought in before he was deemed credible.  The

4    affidavit was based upon his being deemed credible.

5            Do you remember that?

6    A.      Yes.

7    Q.      So you made it a point of bringing in this

8    untested informant, this untested person, who was also

9    somebody that you didn't think was credible, in front of

10   the judge without having him read the affidavit, correct?

11   A.      That's correct.

12   Q.      Was it your purpose in having him examine -- or

13   having Mr. Baszler examined by Judge Tamietti to fully

14   disclose all of the information that you had about Mr.

15   Baszler that might have him deemed not credible by Judge

16   Tamietti?

17   A.      If he wasn't deemed credible, then there wouldn't

18   have been an affidavit.  There wouldn't have been a search

19   warrant to compose.

20   Q.      Well, you had the search warrant already prepared,

21   did you not?

22           I'm sorry.

23           You had the search warrant prepared, the affidavit

24   prepared, prior to the time that you brought Mr. Baszler

25   before Judge Tamietti; isn't that true?

26   A.      I don't remember.

27   Q.      Didn't you have the search warrant with you when

28   Mr. Baszler was brought before Judge Tamietti?

```
 1    A.        I don't remember.
 2    Q.        Well, this all happened on November 2nd, didn't
 3    it?
 4              That is November 2nd, 2004, one day, right?
 5    A.        I don't remember.
 6    Q.        I'm going to have you look at Exhibit 2 that's in
 7    front of you.
 8              And, first of all, looking at Exhibit 2 and the
 9    date of the examination of Mr. Baszler, do you see that the
10    date there is Tuesday, November 2nd, 2004?
11    A.        Yes.
12    Q.        Does that refresh your recollection as to that
13    being the date that Mr. Baszler was examined by Judge
14    Tamietti?
15    A.        Yes.  It says it's an oral affidavit in support of
16    a search warrant.
17    Q.        That was the date that Mr. Baszler was examined,
18    correct?
19    A.        Yes.
20    Q.        And showing you Exhibit 2, which is your search
21    warrant application, do you see here where it's signed by
22    Judge Tamietti?
23    A.        I don't recognize his signature.
24    Q.        Do you see where the judge -- that there is a
25    judge of the superior court that signs off on the affidavit
26    November 2nd at 1:35 p.m.?
27    A.        Yes.
28    Q.        And do you see down below where it says that --
```

1    that it was actually executed on November 2nd, 2004, at

2    1815 hours?

3    A.      Yes.

4    Q.      And that's 6:15, correct?

5    A.      Yes.

6    Q.      Does that refresh your recollection as to whether

7    or not you had this affidavit in support of search warrant

8    and search warrant with you at the time that Mr. Baszler

9    was presented to Judge Tamietti?

10   A.      Yes.

11   Q.      And, in fact, you did have it with you, correct?

12   A.      I believe so.

13   Q.      And it was -- okay.

14           In the search warrant application that you made,

15   you had requested that you be allowed to conduct

16   surveillance of Mr. Baszler entering Mr. Carli's premises,

17   correct?

18   A.      Yes.

19   Q.      And you had prepared this declaration -- strike

20   that.

21           You had prepared this warrant and had it with you

22   before judge -- strike that -- during the time that Judge

23   Tamietti was having Baszler examined, correct?

24           You had already prepared the warrant, right?

25   A.      Yes.

26   Q.      And you knew that in order to have Baszler

27   surveilled by you, that he would have to be out of custody,

28   right?

22

```
1    A.        Yes.
2    Q.        And, in fact, part of your request of Judge
3    Tamietti was that he authorize nighttime service, correct?
4    A.        Yes.
5    Q.        And you wanted nighttime service authorized
6    because you wanted to put Mr. Baszler into the home of Mr.
7    Carli after 10:00 p.m., correct?
8    A.        I wanted that to be an option.
9    Q.        And you also asked the judge for permission to
10   have Mr. Baszler essentially wired for sound, correct?
11   A.        Yes.
12   Q.        And both audio and visual, correct?
13   A.        Correct.
14   Q.        And you also asked that you be given permission by
15   Judge Tamietti to answer both the door and the phone at the
16   Carli residence, correct?
17   A.        Yes.
18   Q.        And, in fact, Judge Tamietti turned you down on
19   all of those three requests, correct?
20   A.        I don't remember.
21   Q.        I'm going to ask you to look at Exhibit 2.
22             And, in fact, the page that I have this on, which
23   is the fifth page of this document, which is right above
24   the signature of the judge of the Superior Court, there is
25   also a line here that says, (reading) Good cause having
26   been shown by affidavit, you may do such of the following
27   as...bear my initials.
28             Do you see that?
```

```
1    A.      Yes.
2    Q.      And there are three places where the initials of
3    the judge could you placed, correct?
4    A.      Yes.
5    Q.      The first one says, (reading) You may serve this
6    warrant at any time of the day or night according to Penal
7    Code Section 1533.
8            Correct?
9    A.      Yes.
10   Q.      The Judge's initial do not appear there, correct?
11   A.      That's correct.
12   Q.      And there is no authorization for you to do
13   nighttime service or service any time, correct?
14           THE COURT:  Mr. Dratman, doesn't that document
15   speak for itself?
16           MR. DRATMAN:  It does, Your Honor.  I just want to
17   make sure that --
18           THE COURT:  You are just wasting time.  I want to
19   complete this hearing this afternoon.  I'm not going to
20   continue it again.
21           MR. DRATMAN:  I have no intention of trying to do
22   that, Your Honor.
23           THE COURT:  You are filibustering.
24           MR. DRATMAN:  I'm not.
25           THE COURT:  It appears to me that you are.
26           That document speaks for itself.  Get on to
27   something else.
28   Q.      MR. DRATMAN:  You were not authorized -- would you
```

1  agree you were not authorized --

2          THE COURT:  He already answered that he was not

3  authorized for nighttime service.

4  Q.      MR. DRATMAN:  Okay.  Were you authorized to

5  conduct audio and/or visual recording of the surveillance

6  of Mr. Baszler prior to the execution of this search

7  warrant?

8  A.      Yes, I was.

9  Q.      Does that appear on this warrant?

10 A.      The initials are not there.

11 Q.      Who authorized you to conduct such surveillance?

12 A.      The judge.

13 Q.      Where did he write that out?

14 A.      When he approved the search warrant.

15 Q.      That is the approval of the search warrant, is it

16 not?

17 A.      Yes.

18 Q.      And you have, as you testified earlier, had many

19 search warrants approved, correct?

20 A.      Yes.

21 Q.      You are familiar with the process of a judge

22 having to initial portions of a search warrant application

23 that have extra items that are requested, correct?

24 A.      Yes.

25 Q.      And Judge Tamietti did not authorize surveillance

26 in writing per his initials on that document, Exhibit 2;

27 isn't that correct?

28 A.      There are no initials on the document before me.

1    Q.      And are you aware of anything in that document
2    signed by Judge Tamietti that authorized you to conduct
3    surveillance using Ben Baszler?
4    A.      It was clearly requested in the affidavit.
5    Q.      And would you agree that it was clearly not
6    authorized by Judge Tamietti?
7    A.      No.
8    Q.      You believe that that document, which speaks for
9    itself, authorized you to use Ben Baszler to conduct
10   surveillance?
11   A.      Yes.
12   Q.      Could you show the Court where it is that it says
13   that?
14           Where is the order of the Court?
15   A.      There are no initials on this document.
16   Q.      In fact, the presentation that you made to Judge
17   Tamietti was one where you had a prisoner in custody, that
18   is Mr. Baszler, correct?
19   A.      Yes.
20   Q.      You had not disclosed to Judge Tamietti that you
21   had arrangements in play to put Mr. Baszler -- to take Mr.
22   Baszler out of custody by dismissing a violation of
23   probation, correct?
24   A.      That was discussed with the district attorney.
25   Q.      It was not discussed with Judge Tamietti who you
26   were asking to have this witness deemed credible and asking
27   to have this warrant signed, correct?
28   A.      I don't know if the district attorney spoke with

```
1   the judge or not.
2   Q.      In fact, you sat through the testimony of Mr.
3   Wolfson at the prior hearing that occurred -- that's in
4   front of you -- on May 19, 2005, and you were aware that he
5   testified -- that is, Mr. Wolfson testified that he had no
6   such discussions with Judge Tamietti?
7   A.      I don't recall that.
8   Q.      Look at page -- of Exhibit 4, that's this
9   (indicating), 22 -- lines 21 through 24.
10          Does that refresh your recollection about Mr.
11  Wolfson saying that (reading) Mr. Baszler had already given
12  the statement to Judge Tamietti so it was done, but in
13  order to get him out, we had to dismiss the affidavit?
14          Wasn't that testimony that Mr. Wolfson gave while
15  you were present?
16  A.      Yes, I believe it was.
17  Q.      And with Mr. -- with Mr. Baszler in custody --
18  strike that.
19          You needed to get Mr. Baszler out of custody in
20  order to accomplish surveillance, correct, of him?
21  A.      Yes.
22  Q.      Why didn't you inform or -- strike that.
23          Why didn't you ask questions of Mr. Baszler
24  concerning his background relating to things that made you
25  think he wasn't credible when he was in front of Judge
26  Tamietti?
27  A.      It's very customary when someone is taken before a
28  judge to be deemed credible that there is a belief that he,
```

1    in fact, may not be credible.  That's the whole purpose of
2    going before the judge; to have the judge make the
3    decision, not the officer.
4    Q.      In order for a judge to make an informed decision,
5    would you agree that the judge needed to be informed of the
6    background of Mr. Baszler and the things that you knew that
7    made you question Mr. Baszler's credibility?
8    A.      Yes.  That's why those things were listed in the
9    affidavit.
10   Q.      But it wasn't listed in the affidavit or any place
11   that he was in custody on a probation violation, correct?
12   A.      I don't remember.
13   Q.      It wasn't listed in the -- in the affidavit that
14   there were instances where you knew him to have lied that
15   are not set forth in the affidavit?
16           You didn't detail all of the instances in which
17   you believed that this man had lied; you just summarized
18   them in a list of 21 different contacts, correct?
19   A.      Yes.
20   Q.      You knew of at least 21 different things that
21   indicated that Mr. Baszler was not a credible person, but
22   you didn't set out all of them for Judge Tamietti, correct?
23   A.      The 21 incidents that you referred to could be
24   simply just calls for service.  They don't detail what the
25   event was or what was involved in it.
26   Q.      You didn't detail what the events were and what
27   was involved in them?
28   A.      Not every incident.  No.  I just listed them.

1  Q.      And you never detailed for Judge Tamietti the
2  reasons why you thought that Mr. Baszler was not credible,
3  correct?
4  A.      The whole purpose of having the hearing before the
5  judge is because he was not deemed credible at the time of
6  the interviews.  So he was taken before the judge to be
7  deemed credible by the judge, not by myself.
8  Q.      And was it your intention to have Mr. Baszler's
9  background and past disclosed to the judge in front of the
10 judge so the judge could make his own credibility
11 determination?
12 A.      That's why the prior arrests and convictions were
13 listed in the affidavit.
14 Q.      That was not done according to your testimony
15 until after Mr. Baszler had left, correct?
16 A.      Left where, sir?
17 Q.      The building.
18         Your testimony has been that Mr. Baszler was
19 brought in first, that the affidavit was not presented to
20 the judge, and that Mr. Baszler was questioned by the judge
21 without the background.  Wasn't that your testimony both
22 prior to -- both when we last convened on May 19 and at
23 least twice in this hearing?
24 A.      Sir, this questioning, this oral affidavit, is
25 part of the affidavit.
26 Q.      You had not presented the judge with any of the
27 information that you had concerning Baszler's lack of
28 credibility --

1          THE COURT:  Mr. Dratman, haven't you established
2   that about 10, 15 different ways already?
3          MR. DRATMAN:  Your Honor, I believe so.
4          THE COURT:  Then why do you keep at it?
5          Answer my question.  Why do you keep at it, then?
6          MR. DRATMAN:  I'm going to move on to something
7   else, then, Your Honor.  I can't give a good answer to
8   that.
9          THE COURT:  Okay.
10          MR. DRATMAN:  You know, I always try to answer the
11   Court's questions directly, and that was the --
12          THE COURT:  The reason is obvious, Mr. Dratman.
13   Get "on to something else," as you say.
14   Q.     MR. DRATMAN:  Isn't it a fact that Mr. Baszler is
15   the person that volunteered to wear a wire to try to get
16   evidence against Mr. Carli?
17   A.     Yes.
18   Q.     And that it was Mr. Baszler who brought that up
19   with you almost immediately in your discussions with him,
20   correct?
21   A.     Yes.
22   Q.     And it was Mr. Baszler who indicated that he did
23   that because he wanted to get out of jail and help you,
24   correct?
25          THE COURT:  You mean, was that Baszler's motive?
26   Is that what you are asking?
27          MR. DRATMAN:  Yes.
28          I'll withdraw that.

1   Q.      MR. DRATMAN:  Did Baszler say that he wanted to
2   get out of jail?
3   A.      I don't recall that he specifically said that.
4   Q.      The information that you provided in your
5   declaration -- strike that -- in your affidavit in Exhibit
6   2 relating to the allegations of child molest and child
7   pornography, the source of that information was Mr.
8   Baszler, correct?
9   A.      Not entirely.
10  Q.      For the most part, the current information, the
11  most current information that you had concerning that was
12  Mr. Baszler's allegations of approximately two years
13  before, correct?
14  A.      Yes.
15  Q.      And relating to your desire to get a search
16  warrant that allowed the search of computers and the
17  seizure of computers and CD-ROMS and those kinds of things,
18  you relied virtually entirely upon Mr. Baszler to establish
19  the basis for that, correct?
20  A.      No.
21  Q.      Did you interview any other persons in relation to
22  your request to have a -- Judge Tamietti issue a search
23  warrant for the seizure of computers and CD-ROMs?
24  A.      Not that I remember.
25  Q.      Did you interview anybody else that -- relating to
26  your request to have Judge Tamietti authorize the seizure
27  of pornography, child pornography, adult pornography?
28  A.      Um, I did speak with investigators from the prior

1  arrest and prior search warrants.

2  Q.      That was from 2002, correct?

3  A.      Yes.

4  Q.      And that was approximately two years before that,

5  correct?

6  A.      Yes.

7  Q.      Did you speak to any persons that were alleged

8  victims of Mr. Carli other than Mr. Baszler?

9  A.      Yes.

10  Q.      That you listed in your affidavit before Judge

11  Tamietti?

12  A.      I don't know if they were listed in that

13  affidavit.

14  Q.      Okay.  You did not list the primary source of your

15  information as an alleged victim in this case justifying

16  seizure of computers, et cetera, was Benjamin Baszler,

17  correct?

18  A.      No.  The primary source was terms of search and

19  seizure.

20  Q.      The primary source of your information that you

21  were presenting to Judge Tamietti was Benjamin Baszler,

22  correct?

23  A.      Yes.

24  Q.      And of the items that -- of the incidents that Mr.

25  Baszler told you about, you were not able to corroborate

26  independently any of the things that he told you about his

27  alleged sexual encounters with Mr. Carli; isn't that

28  correct?

```
1    A.        That's why he was brought before the judge.
2    Q.        You -- you were unable to corroborate what Mr.
3    Baszler had said to you about his allegations against Mr.
4    Carli, correct?
5    A.        No.   Some of them were corroborated.
6    Q.        The sexual allegations that he made against Mr.
7    Carli, you were unable to corroborate, which is why you
8    needed him to be deemed credible; is that right?
9    A.        Yes.
10   Q.        And you wrote in your affidavit that there was a
11   pending criminal case within the Nevada County Superior
12   Court against David Carli regarding a violation of 311 PC,
13   child pornography, correct?
14   A.        Yes.
15   Q.        Now the Nevada County Superior Court accepts
16   felony cases for prosecution, correct?
17   A.        Yes.
18   Q.        And they accept misdemeanor cases for prosecution,
19   correct?
20   A.        Yes.
21   Q.        And you became aware by sitting through the
22   hearing before Judge Tamietti on May 19, 2005 -- I believe
23   that's Exhibit 4 -- that there was no pending case in the
24   Nevada County Superior Court against David Carli regarding
25   a violation of 311 PC, correct?
26   A.        Yes.
27            MR. DRATMAN:   Your Honor, I may be done.   Would
28   this be an okay time to take an afternoon break here?
```

```
1              THE COURT:  No.
2              MR. DRATMAN:  Okay.
3              THE COURT:  Mr. Dratman, I want to end these
4    proceedings this afternoon.  It's been going on for years,
5    literally, and I wanted to allow counsel a few minutes to
6    summarize what they've been trying to prove or disprove for
7    the last year and a half.  And by your method of examining
8    witnesses over the months and over the years, it's taken
9    too much time.
10             These proceedings are going to end about 4:15 this
11   afternoon --
12             MR. DRATMAN:  I understand.
13             THE COURT:  -- including arguments.
14             MR. DRATMAN:  That's fine, Your Honor.
15             THE COURT:  That's why I don't want to take a
16   recess now.
17             MR. DRATMAN:  Just give me a chance to go through
18   my notes.
19   Q.        MR. DRATMAN:  After you arrested Mr. Baszler on
20   October 29 --
21             THE COURT:  What year?
22             MR. DRATMAN:  2004.
23   Q.        MR. DRATMAN:  The procedure that your department
24   recognizes is one where two persons go and interview a
25   particular individual concerning information; is that
26   correct?
27   A.        Well, I work for two different departments.  I
28   work for the Nevada County Sheriff's Task Force and I work
```

1    for the Nevada City Police Department.

2           And in the Nevada City Police Department, it was

3    not common that more than one officer would conduct an

4    interview.  In the narcotics task force, it was very common

5    and practically a standing rule that when we interviewed,

6    there would be two of us.

7           I hope that answers your question.

8    Q.     You had a meeting with Mr. Baszler where you came

9    back to see him, after his arrest, alone, correct, before

10   you brought in Investigator Casci?

11   A.     I don't remember.

12   Q.     That was on the evening of October 29.  Following

13   the time that you arrested Mr. Baszler, you returned to the

14   jail alone and spoke with him, correct?

15   A.     Yes, I do recall now.

16   Q.     And you spoke with him alone, which is when Mr.

17   Baszler expressed to you his desire to get out of jail,

18   correct?

19   A.     I don't remember that.

20   Q.     And it was after that, on October 31st, that you

21   brought in Investigator Casci to the jail, right?

22   A.     Yes.

23   Q.     How long was your meeting with Mr. Baszler on

24   October 29, the meeting where you returned to the jail

25   alone?

26   A.     I don't recall.

27   Q.     When you began questioning Mr. Baszler in front of

28   Judge Tamietti on November 2nd, 2004, did you initially ask

```
 1    him, (reading) And, first off, we need to clarify for the
 2    Court, you haven't been made any promises in any way for
 3    any consideration for this information that you are willing
 4    to share with us; is that correct?
 5             Did you ask him that question?
 6    A.       Yeah.
 7    Q.       And did he answer, (reading) No?
 8    A.       That would have been the correct answer.
 9    Q.       Actually, you said, (reading) Is that correct?
10             And he disagreed.  He said, (reading) No.
11             It wasn't correct.  Did you clarify that with him?
12    A.       I don't remember.
13    Q.       You know what I'm talking about?  It's page three,
14    at the bottom of Exhibit Number 2.
15             Then it goes over to a blank page, and then you
16    say, (reading) is that correct?
17             And he says, (reading) No.
18             Had you, in fact, told Mr. Baszler that he was
19    going to be getting out of jail because the probation
20    violation was going to be dismissed?
21             Sergeant Badour?
22    A.       No, because the court hadn't yet approved the fact
23    that he would have been allowed to be surveilled at the
24    beginning of the search warrant.
25    Q.       Had you -- you had already arranged with -- with
26    District Attorney Wolfson to have that probation violation
27    dismissed, correct?
28    A.       Yes, at that time.
```

1   Q.      And you picked up Mr. Baszler at the jail,
2   correct?
3   A.      Yes.
4   Q.      And you transported him, correct?
5   A.      Yes.
6   Q.      And between the time that you picked him up at the
7   jail and the time that you transported him, you told Mr.
8   Baszler that you had arranged for the probation violation
9   to be dismissed by Mr. Wolfson; isn't that correct?
10  A.      Yes.
11  Q.      That was not disclosed to Judge Tamietti, correct?
12  A.      I don't know.
13  Q.      You didn't disclose that to Judge Tamietti,
14  correct?
15  A.      No, I did not.
16  Q.      Mr. Baszler didn't disclose that to Judge
17  Tamietti, correct?
18  A.      Not that I'm aware of.
19  Q.      And you didn't hear Mr. Wolfson disclose that to
20  Judge Tamietti, correct?
21  A.      Well, they talked about it.  We addressed it not
22  along ago in the affidavit.
23  Q.      In fact, it was Mr. Wolfson who said that he
24  didn't bring it up to Judge Tamietti.  He brought it up to
25  yet another judge, correct?
26  A.      I don't remember that.
27  Q.      You were present during that testimony.  We just
28  went over that.

```
1              You heard Mr. Wolfson testify about that in a
2    prior proceeding, correct?
3    A.        Yeah.  There were several proceedings that he
4    testified in.
5              MR. DRATMAN:  If I could just have a moment, Your
6    Honor.
7              Your Honor, at this time I have no further
8    questions of this witness.
9              THE COURT:  Redirect?
10             MR. STEGMAN:    Thank you.
11                        REDIRECT EXAMINATION
12   Q.        MR. STEGMAN:   Referring to Exhibit 2, the search
13   warrant affidavit and oral affidavit transcript.
14   A.        Yes.
15   Q.        Mr. Dratman asked you -- I believe it was on page
16   three -- if you had asked Ben Baszler if he had been
17   promised anything, but you had asked it in the negative,
18   and his answer was no.  It was unclear whether he was
19   saying yes or no.
20             I want you to turn to page 19 of the oral --
21             MR. DRATMAN:  Your Honor, I do object to that.
22   That is not a question.
23             THE COURT:  We haven't heard the question yet.
24             Overruled.
25   Q.        MR. STEGMAN:   Turn to page 19, please, of the
26   oral affidavit.
27   A.        (Witness complies.)
28   Q.        And read it to yourself, if you would, lines 8
```

1  |  through 14.  And then tell me if that refreshes your
2  |  recollection.  Tell the court.
3  |  A.      Yes.
4  |  Q.      Did you follow up?
5  |  A.      Yes.
6  |  Q.      What did you ask him?
7  |  A.      I asked him again for clarification and reiterated
8  |  that he was asked earlier and that (reading) no one has
9  |  made any promises or any expectations in any way of any
10 |  consideration for this information that he was coming
11 |  forward with.
12 |  Q.      What was his response?
13 |  A.      "No."
14 |  Q.      Did he continue?
15 |  A.      Yes, he did.
16 |  Q.      What did he say?
17 |  A.      This is for my own personal benefit and piece of
18 |  mind.
19 |  Q.      Then if you would go to page 24.
20 |  A.      (Witness complies.)
21 |          THE COURT:  This is page 24 of the oral testimony?
22 |          MR. STEGMAN:   Yes, Your Honor.
23 |  Q.      MR. STEGMAN:   Did Investigator Casci follow up
24 |  and ask the same question in different words?
25 |  A.      Yes.
26 |  Q.      And is that on lines 2 through 5 of page 24?
27 |  A.      Yes.
28 |          He said, (reading) Just, again, there has been no

```
 1    promises made to you or no expectations on your behalf; is
 2    that correct?
 3    Q.      And what did the witness answer?
 4    A.      (Reading) No.
 5    Q.      Did the judge follow up at all?
 6            That may not be a fair question.  I'll let the
 7    transcript speak for itself.
 8            What I'd like to do is have you -- actually, let
 9    me ask you this.  Do you -- as you sit here today, do you
10    know whether you presented the judge with your written
11    affidavit prior to Benjamin Baszler being examined by you
12    and the judge?
13    A.      I don't know.
14    Q.      So let me ask you this, then.  Did you provide the
15    judge with the written affidavit prior to him signing the
16    search warrant?
17    A.      Yes.
18    Q.      And in that written affidavit -- I'm sorry.
19            Mr. Dratman asked you if it was your intention to
20    hide from the judge that Benjamin Baszler was on probation.
21            Was that your intention?
22    A.      Never.
23    Q.      Mr. Dratman asked you if it was your intention to
24    hide from the Court Mr. Baszler had been arrested for a
25    number of offenses, sex offenses.
26            Was that your intention?
27    A.      Never.
28    Q.      In the written affidavit presented to the judge,
```

1   did you, in fact, set forth that the defendant was -- I'm
2   sorry -- that Mr. Baszler was on probation and that Mr.
3   Baszler had been arrested for sex offenses?
4   A.      Yes.
5   Q.      And specifically referring to page 13 of your
6   written affidavit, which is Exhibit 1 -- I'm sorry --
7   Exhibit 2.
8           If you would go to page 13.
9   A.      (Witness complies.)
10  Q.      And did you tell judge -- the judge in your
11  written affidavit that Benjamin Baszler had contacts with
12  law enforcement regarding theft, disorderly conduct,
13  marijuana, suspicious activity, suspicious vehicle, and
14  that he was currently on juvenile probation?
15  A.      Yes.
16  Q.      That was in your written affidavit?
17  A.      Yes.
18  Q.      And if you would go to page 9, please, of Exhibit
19  2.
20  A.      (Witness complies.)
21  Q.      Did you tell the judge in your written affidavit
22  that Benjamin Baszler had been arrested by you on October
23  29 starting with line 3?
24  A.      Yes.
25  Q.      Did you tell the judge in your written affidavit
26  that the defendant was, in fact, arrested for 836 PC,
27  committing felony -- I'm sorry.
28          836, is that a probable cause arrest?

```
 1   A.       Yes, it is.
 2   Q.       Okay.  And that you had arrested him based on
 3   probable cause for committing a felony --
 4            (Clarification by the court reporter.)
 5   Q.       MR. STEGMAN:   -- arrested for committing felony
 6   violations of unlawful sexual intercourse with a person
 7   under 18?
 8   A.       Yes.
 9   Q.       Lewd, lascivious acts?
10   A.       Yes.
11   Q.       Continuous sexual abuse of a child?
12   A.       Yes.
13   Q.       That these occurred in Nevada City, Nevada County?
14   A.       Yes.
15   Q.       Did you advise the judge in a written affidavit
16   that Mr. Baszler lied to you when you confronted him with
17   this?
18            Referring you to lines 12 through 16 -- pardon
19   me -- lines 12 through 21.
20   A.       Yes.
21   Q.       And if you would flip to page 22 of your written
22   affidavit.
23   A.       (Witness complies.)
24   Q.       Did you sign this written affidavit before the
25   judge?
26   A.       Yes.
27   Q.       Did you sign it?
28            Looking at page 22, does it appear that the judge
```

1    had written in that you signed this at 12:00 p.m. on

2    November 2nd?

3    A.      Yes.

4    Q.      If you would go to page 34 of the oral affidavit.

5            Does the judge sign that he issued the search

6    warrant on November 2nd at 1:45 p.m. after the oral

7    affidavit and after the written affidavit was presented?

8    A.      Yes.

9            MR. STEGMAN:   Nothing further, Your Honor.

10           THE COURT:  Re-cross?

11           MR. DRATMAN:  No, Your Honor.

12           THE COURT:  All right.  I have no questions.

13           You can step down, Sergeant Badour.

14           THE WITNESS:  Thank you, Your Honor.

15           THE COURT:  I take it there are no further

16   witnesses, Mr. Stegman?

17           MR. STEGMAN:   No, Your Honor.  No further

18   witnesses.

19           THE COURT:  Mr. Dratman?

20           MR. DRATMAN:  No, Your Honor, subject to moving in

21   exhibits.

22           THE COURT:  I thought you had all your exhibits

23   in.

24           MR. DRATMAN:  I think so.  I just want to make

25   sure.

26           THE COURT:  The only ones that aren't in are

27   something that may have been used in the last few minutes.

28           COURTROOM DEPUTY:  Just the top list and these

```
 1   few.
 2              THE COURT:  Yeah.  There are several exhibits that
 3   were identified but not offered into evidence.
 4              MR. DRATMAN:  Exhibit K was just identified by the
 5   witness, and if it hasn't been offered, I will offer it
 6   now.
 7              MR. STEGMAN:  If I may, Your Honor?
 8              THE COURT:  I sustained an objection when you
 9   offered that last -- in the past, Mr. Dratman, but I can't
10   remember what it was.
11              MR. DRATMAN:  This was just -- this is the -- this
12   was just identified today by Sergeant --
13              THE COURT:  You have it listed as an exhibit that
14   was identified prior to today?
15              MR. DRATMAN:  Yes.  I had this exhibit identified
16   by Sergeant Badour as the declaration in support of
17   complaint and report of officer Burke, that he read,
18   relating to the arrest of Ben Baszler.
19              THE COURT:  Okay.  I can't remember the objection.
20   I'm not going to go over all my notes now.
21              MR. STEGMAN:  May I have a moment to review K?
22              THE COURT:  Okay.  I'm going to go ahead and admit
23   K.  It saves time.  So K will be in evidence and AA and BB
24   will also be admitted.
25              (Exhibits K, AA & BB were received into
26   evidence.)
27              MR. DRATMAN:  Your Honor, is H in evidence?  I'm
28   sorry, but I --
```

```
1              THE COURT:  Yes.
2              MR. DRATMAN:  Okay.  Good.
3              And I and J, are they in evidence?
4              THE COURT:  Yes.
5              MR. DRATMAN:  Okay.
6              THE COURT:  Both sides rest?
7              MR. STEGMAN:  Yes, Your Honor.
8              MR. DRATMAN:  Yes, Your Honor.
9              THE COURT:  Okay.  We've got a few minutes.  I'll
10   allow a summary argument.  Keep in mind this matter has
11   been before me for quite some time.  As a matter of fact,
12   I'm just appalled as I go through my notes that this
13   indictment was filed on August 6 -- in August 2006, over
14   four years ago.  Defendant was arraigned on August 21, '06,
15   over four years ago.
16              The motion to suppress hearing was scheduled to be
17   heard on October 19, 2007, over two years ago.  And from
18   then it's just been stretched out, and it makes it
19   difficult to keep it all together.
20              And the examination of witnesses during the Franks
21   hearing didn't help.
22              I'll here from the prosecution -- wait a minute.
23   I'll here from the moving party, Mr. Dratman.
24              MR. DRATMAN:  Thank you, Your Honor.
25              MR. DRATMAN:  Thank you, Your Honor.
26              THE COURT:  Has the defendant been in custody all
27   this time, Mr. Dratman?
28              MR. DRATMAN:  Yes, Your Honor.
```

1          This search warrant and the subsequent search

2     warrant obtained by the FBI rests virtually entirely -- for

3     the purpose of dealing with those aspects that relate to

4     the computer and computer type evidence such as CDs and

5     those types of things -- they depend virtually entirely

6     upon Benjamin Baszler as conceded by this witness.

7          But a review of the search warrant affidavit, both

8     the oral declaration as well as the written affidavit,

9     disclose that information that should have been given to

10    Judge Tamietti was simply not provided to him.

11         I've been appearing in front of this Court for

12    over 30 years, both state and federal court.  Witness comes

13    in in custody and not to have someone disclose the reason

14    why he's in custody or to have the judge inquire or be told

15    why he's in custody and that he is on $50,000 bail -- which

16    he is in front of the Court for a violation of probation

17    on -- and not to disclose that on the way to see the judge,

18    that this witness had been told that that violation of

19    probation was going to be dismissed and not to be -- and

20    that was not disclosed is something that goes to the heart

21    of the whole process relating to Benjamin Baszler.  We just

22    found that out today.

23         We also found out, and it was highlighted by

24    myself and by Mr. Stegman, that twice this witness answered

25    the question, (reading) Is that correct? in response to,

26    (reading) You haven't been made any promises in any way for

27    any consideration for this information you are willing to

28    share with us; is that correct?

46

1          He answers, (Reading) No.

2          And then Investigator Casci says, (reading) Just,

3    again, there has been no promises made to you or no

4    expectations on your behalf; is that correct?

5          (Reading) No.

6          Those promises that were made related to the fact

7    that this affidavit was drawn up with a contemplation that

8    Mr. Baszler was going to be released from custody.  It's

9    disclosed throughout.  It's disclosed in the testimony that

10   you don't do surveillance of Mr. Baszler going inside the

11   premises.  It was conceded that he had to be out of custody

12   to do that.

13         And that was a significant benefit, a significant

14   consideration.  A bail of $50,000 and a violation of

15   probation being dismissed is a significant consideration

16   that both the district attorney, this affiant, knew about

17   as well as Mr. Baszler that was never disclosed to Judge

18   Tamietti.

19         That is of the type of consideration that would

20   sway a witness to provide false information, which, as the

21   witness concedes, was not corroborated.

22         This evidence was conceded by the witness; that is

23   the allegations of sexual assault described by Ben Baszler,

24   this witness conceded that he had no corroboration for it

25   other than Baszler, which is why he needed to go through

26   this process of deeming him to be credible.

27         But when you conceal from the magistrate judge

28   sitting there the promises that you've made to a particular

1    witness -- and the witness actually honestly says something

2    that is inconsistent with that, and nobody follows up and

3    discloses -- there is -- part of this whole process is

4    this -- the fact that on November --

5         This is the way that it works.  On October 29th

6    he's arrested by a -- by Sergeant Badour.  The man lies to

7    Sergeant Badour about his -- first of all, Sergeant Badour

8    testifies that he never questioned Ben Baszler, never

9    Mirandized him, testified under oath before this Court that

10   he never did that.  And then in his declaration it was

11   pointed out to him that he swore under penalty of perjury

12   that, in fact, he had Mirandized him and that Baszler lied

13   to him.

14        We have problems with Sergeant Badour and

15   credibility, as well.  He contradicted himself under oath

16   before this Court.  He testified that Mr. Baszler was

17   someone that he went back to see.  He testified throughout

18   that he had not made him any promises.  But, in fact, he

19   had made him a promise.  He assured him the probation

20   violation would be dismissed.  And he was out of custody in

21   what was a very circuitous way.

22        He was arrested on very serious sex charges.  A

23   violation of probation is filed on Monday, November 1st,

24   where, according to the evidence that's before this Court,

25   a judge, Judge Dover, sets bail at $50,000.

26        Ronald Wolfson, whose testimony is before this

27   Court in Exhibit 4, testifies that he --

28        THE COURT:  What is Exhibit 4?  Was that testimony

1    before another judge?

2              MR. DRATMAN:  It was, Your Honor.

3              THE COURT:  What judge was that?

4              MR. DRATMAN:  Judge Tamietti.  It was on the

5    hearing that -- that related to the motion to suppress

6    evidence conducted by Mr. Munkelt in Nevada County Superior

7    Court.

8              THE COURT:  Yeah.  That's been bothering me that

9    apparently two other judges have heard this motion and

10   denied it?

11             MR. DRATMAN:  No, Your Honor.  Quite to the

12   contrary.  It was only one other judge that heard part of

13   this motion, Judge Tamietti, and the case resolved itself.

14             THE COURT:  I thought one of our magistrates heard

15   it.

16             MR. DRATMAN:  No.  This motion was never heard by

17   any judge other than you to appoint where a decision has to

18   be made.  Absolutely not.

19             The case relating to Mr. Carli that was the

20   subject of Exhibit 4 resolved itself with no -- by the way,

21   with a plea to a misdemeanor charge.

22             And Judge Tamietti was -- was waiting to hear

23   evidence from Ben Baszler, who did not appear.  And as a

24   result of that, the case resolved itself.  So there was

25   never a decision by Judge Tamietti, who was prepared to

26   continue to listen to evidence --

27             THE COURT:  What is this transcript about of over

28   100 pages that was submitted by the prosecution?

1          MR. DRATMAN:  It was, Your Honor.

2          THE COURT:  Who was that judge?

3          MR. DRATMAN:  It was Judge Tamietti.

4          THE COURT:  And I thought he reviewed these same

5    issues.

6          MR. DRATMAN:  He did not decide them.  He allowed

7    a Franks hearing to proceed based upon allegations that

8    were made relating to the manner in which this search

9    warrant affidavit was authorized by him, the information

10   that he was not provided, and the information that he was

11   provided.  Testimony was taken from Ronald Wolfson --

12         THE COURT:  Okay.  Okay.  Okay.

13         MR. DRATMAN:  Testimony was taken from --

14         THE COURT:  I'm going to take a few minutes to go

15   over my notes before I --

16         MR. DRATMAN:  It was a very lengthy -- in fact,

17   this officer --

18         THE COURT:  I read that transcript.

19         MR. DRATMAN:  Yes.

20         And I agreed that it should be before the court.

21         THE COURT:  Both sides agreed.  That's why I read

22   it.

23         MR. DRATMAN:  Which is why, Your Honor, I didn't

24   go into the questioning of Sergeant Badour on matters that

25   had been handled by Mr. Munkelt.  And I expect -- I hope

26   the Court will take into account the questions and the

27   answers that came about as a result of that hearing,

28   because they are equally relevant to the questions here.

1          And the questions here are whether or not Mr.

2     Baszler should be deemed credible by this Court.

3          THE COURT:  Well, that's one of the issues, yes.

4          MR. DRATMAN:  And whether or not as a result of

5     the omission of -- strike that -- as a result of the

6     misrepresentations relating to Baszler and as a result of

7     the omissions concerning Baszler and the fact that this

8     judge was informed and didn't find out until the hearing

9     came about that David Carli was facing charges in Nevada

10    County Superior Court for child pornography when, in fact,

11    in that hearing transcript it was established, as conceded

12    by Sergeant Badour, that there was no such case pending,

13    there was no child pornography case that was pending in the

14    Nevada County Superior Court.

15         THE COURT:  Okay.

16         MR. DRATMAN:  This -- in addition to that, we have

17    a situation in which this Court has even acknowledged --

18    well, maybe this Court hasn't acknowledged.

19         Ben Baszler is somebody that this witness,

20    Sergeant Badour, indicated was somebody he didn't deem to

21    be credible and needed a judge to deem him to be credible.

22    He was simply not credible.  He was a person that Sergeant

23    Badour knew not to be credible.

24         He was a person that should not have been posited

25    with a court as being reliable, as being somebody that

26    could be trusted, as somebody that had told the truth and

27    could be relied upon to tell the truth in the issuance of

28    this warrant.

```
1           We have a serious problem with Sergeant Badour, as
2    well, because if this Court examines Exhibit 2, which is
3    the Government's exhibit, which I agreed to and which is a
4    copy of the exhibit that I have which is the search
5    warrant, there is no place where Judge Tamietti authorizes
6    the audio and visual recording of surveillance of Mr.
7    Baszler before the execution of the search warrant.  It's
8    simply not there.
9           A request is made for it.  That request -- I tell
10   the Court that the circumstantial evidence is that that
11   request was something that was made clear to Mr. Baszler;
12   that that was part of the consideration, that he was going
13   to be able to get out and assist them; that he wanted to
14   work for them in order to do himself better, contrary to
15   his words.  Words, by the way, which are subject to a great
16   deal -- should be subject to a great deal of skepticism.
17          This is a situation in which if this Court was not
18   told that a person that was put in front of him was on
19   probation, $50,000 bail, and that he had been told that
20   he'd be released on probation, I can't imagine -- I can't
21   imagine what I would have to explain to this Court about
22   not telling this Court.
23          I've been in -- I've been appearing before this
24   Court for years, and I cannot imagine the reaction of this
25   Court not to know something like that.  That is huge.  It
26   is significant.  And it is part and parcel of the reasons
27   why Ben Baszler's statements in this affidavit and his oral
28   declaration should be completely discounted.
```

1          And that portion of this warrant that authorized

2    the seizure of computers and those things related to

3    computers and everything relating to this prosecution in

4    this case should be suppressed.  Because, simply put,

5    somebody tried to put the -- pull the wool over Judge

6    Tamietti's eyes and succeeded.

7          Not completely, because he didn't authorize the

8    surveillance, but why would he?  As far as he knew, Ben

9    Baszler was in custody.  How could he authorize

10   surveillance by Baszler if he's in custody?

11         He should have been told that was the plan.  He

12   wasn't told anything about the plan.  And yet a third

13   judge, Judge Dover, put the bail on of $50,000.  Judge

14   Tamietti wasn't told about it.  And a third judge, Judge

15   Darlington, according to the evidence before this Court,

16   dismissed the application.

17         This was not something that was done that was

18   ministerial.  It was done by the same prosecutor, Ron

19   Wolfson, who was present when the $50,000 bail was imposed

20   on the violation of probation.  The same Ron Wolfson who

21   reviewed the affidavit and was present, according to the

22   testimony of Sergeant Badour during the oral application

23   process, and he was the same Ron Wolfson who asked a

24   different judge, Judge Darlington, to dismiss that

25   violation of probation, all of which was not disclosed.

26   None of which was disclosed to Judge Tamietti and should

27   have been done.

28         Because of that, I ask this Court to follow the

1 procedure set forth in Franks and his progeny and eliminate
2 all that part of the affidavit and the oral application
3 relating to Ben Baszler.  If the Court does that, there is
4 no justification for the issuance of this warrant.
5       I also tell the Court that the argument that
6 somehow the -- this was a search justified as a result of a
7 search clause was something simply not put forth in front
8 of Judge Tamietti, nor was it something relied upon by this
9 officer, the Nevada County Sheriff's Department, Nevada
10 County Police Department, at all.
11       They didn't go through an informal process here of
12 doing a search pursuant to a search condition.  They sought
13 and obtained a warrant because, as the testimony disclosed
14 here, the search condition was limited to marijuana, and it
15 was a misdemeanor case.  And --
16       THE COURT:  Well, I'm not so sure about that.  But
17 in your experience, you have known of investigators who had
18 a right -- an apparent right to search on a probation
19 search and went out and got a warrant anyway, right?
20       You've seen that before, haven't you?
21       MR. DRATMAN:  In my cases, no.  This is --
22       THE COURT:  I've seen it many times.
23       MR. DRATMAN:  Well, that is -- however, we
24 don't --
25       THE COURT:  Wait a minute.  Okay.  So you have
26 never seen it in your cases.  I have seen it.
27       MR. DRATMAN:  Well, this is a case --
28       THE COURT:  It's not that unusual.

1           MR. DRATMAN:  Well, I find this whole process to
2    be unusual.

3           THE COURT:  You may not like the process, but I'm
4    telling you it's not that unusual for an investigator to
5    get a warrant even though he may believe that he has
6    probable cause.

7           MR. DRATMAN:  Well, in this particular case,
8    though, because of the testimony before this Court, there
9    is certainly not clear and convincing evidence, let alone
10   evidence by a -- excuse me -- there is not evidence by a
11   preponderance of the evidence let alone clear and
12   convincing evidence that the search condition that applied
13   to Mr. Carli allowed the search that they were seeking in
14   this case.  And that was because of the manner in which
15   Nevada County did limit their searches.  And we have proof
16   of that before this court.

17          And this was a situation in which -- in which such
18   a limitation in Nevada County was present.  And there is --
19   there is no evidence to the contrary out of the testimony
20   of this officer or his -- this sergeant or his actions to
21   the contrary of that.

22          His actions were consistent with the type of
23   limitation that is routinely placed or that was routinely
24   placed -- in fact, placed in another case involving Mr.
25   Carli -- in marijuana cases allowing for a limited search.

26          And that's why this is consistent with trying to
27   get a warrant issued with very bad information, misleading
28   a magistrate, and omitting to tell a magistrate quite

1    material facts about a person that this sergeant said was
2    not credible.
3            I'd ask the Court to grant the motion to suppress.
4            THE COURT:  Very well.
5            Mr. Stegman?
6            MR. STEGMAN:   Thank you, Your Honor.
7            Your Honor, first, I would like to -- first, I'd
8    like to request that the Court find that this -- this
9    search was proper and legal as a search based on the
10   probation conditions.
11           And I would refer the Court to Government's
12   Exhibit 1, which shows that the defendant was on probation,
13   and that there were no limitations stated in the written
14   probation order.
15           And Mr. Dratman argues that the officer didn't
16   rely on the probation condition when they searched Carli's
17   residence.  And, first of all, I believe he testified today
18   based on questions -- the questions from Mr. Dratman in
19   regards to whether he relied mainly or solely on Ben
20   Baszler, Sergeant Badour testified that he relied on the
21   probation condition.  So there is that evidence of the
22   officer subjectively relying on a probation condition.
23           But my understanding of the law is that when the
24   Court reviews whether a search was proper, it's an
25   objective determination.  It's not subjective, based on how
26   well an officer knows the law and whether they have all of
27   the bases for a search in mind at the time.  We don't look
28   at it that way.  We look at the evidence and the law and

1    whether a search was justified under the law, and it's the

2    objective determination.

3              And based on the information moved into evidence,

4    the defendant was on searchable probation.

5              Second --

6              THE COURT:  Was that brought up?  Why is it in my

7    mind that that was brought up by the -- either in the

8    affidavit?  Is that where I first saw it?

9              MR. STEGMAN:  I believe so.

10             That the defendant was on probation with searching

11   conditions?

12             THE COURT:  Yes.

13             MR. STEGMAN:  I believe so.

14             Can I have a moment?

15             THE COURT:  I remember it came to my attention

16   during one of these several hearings on this motion.

17             Never mind.  I can probably find it quicker than

18   you can.

19             MR. STEGMAN:  Okay, Your Honor.  I'd like to move

20   to the issue of the credibility of the officer, and then

21   I'll talk about Ben Baszler and the affidavit in regards to

22   Ben Baszler.

23             But the credibility of Dan Badour has been

24   questioned by Mr. Dratman.  And he says that he has

25   contradicted himself and that he told the Court that he had

26   told Ben Baszler that the violation of probation would be

27   dismissed.  In other words, that he had made a promise, and

28   I don't believe that that was the testimony of Sergeant

1   Badour.  I believe the testimony of Sergeant Badour is he
2   made no promises to Ben Baszler.
3           In regards to the questioning during the oral
4   examination, the oral affidavit, the questioning of Ben
5   Baszler as to whether or not any promises were made, he was
6   asked three times.  The judge was there.  The judge could
7   have followed up.  It was clear that Ben Baszler was saying
8   no promises had been made.
9           As a matter of fact, it was just after David --
10  Mr. Dratman tried to make that point that he -- Ben Baszler
11  answered the question -- answered "no" to a question asked
12  in the negative.
13          Your Honor asked both Mr. Dratman and me, "There
14  are no further witnesses?"  "The parties have no further
15  witnesses?"  And I said, "No," and Mr. Dratman said, "No,"
16  and I don't think there is any difference between my "No"
17  and Mr. Dratman's "No" and Mr. Baszler's "No," because
18  based on Mr. Dratman's argument, I should have said, "Yes.
19  No further witnesses," and Mr. Dratman should have said,
20  "Yes.  No further witnesses," but we both said "no."
21          It was clear from the transcript of Ben Baszler
22  that he also meant that he did this of his own free will
23  and that no promises were being made.
24          I think there has also been -- moving on to
25  whether Mr. Baszler was credible.  I don't think this
26  Court -- I don't think the law is that this Court looks at
27  Mr. Baszler's testimony and makes the determination of  ·
28  whether he told the truth in the affidavit, because he's

1    not the affiant.

2            He was -- the affiant for the search warrant was

3    Dan Badour.  And I don't think that the law and I don't

4    think the remedy of suppression goes to a witness who may

5    be lying who we can then prove later was lying.  I don't

6    think Mr. Baszler was lying.

7            But if you believe the defense argument -- if a

8    witness turned out to be lying and we can prove in court

9    the witness was lying, that in no way goes to the

10   credibility or the intention of the officer.  It in no way

11   would help keep police honest by suppressing evidence,

12   because a witness lied, and we later proved a witness lied.

13           What we look at is whether or not the affiant to

14   the search warrant was truthful; whether the affiant to the

15   search warrant failed to disclose important information to

16   the judge that would have made a difference.

17           And in this case the affiant didn't do that.  The

18   affiant brought the witness in, and the affiant told the

19   judge the witness had been arrested on a felony for a

20   number of felony violations; that the witness was on

21   probation; brought the witness before the judge for a

22   credibility determination.

23           There has been no evidence throughout all of these

24   proceedings that the officer lied in any way to the Court

25   about promises or threats or manipulated the judicial

26   system in an improper way.  There has been no evidence of

27   that.

28           So I'd like to now argue that Ben Baszler was

1    properly believed; that there is no reason to believe that
2    the officer was wrong in believing what Ben Baszler had to
3    say.
4            Let me frame this a little bit.  I think the
5    defense argument is this:  That we should suppress the
6    evidence because Officer Badour knew that what Ben Baszler
7    was saying was false, yet he proceeded to present that to
8    the judge anyway.
9            And what I want to point out to the Court is that,
10   first of all, there was quite a bit of corroboration -- not
11   just been Baszler, but quite a bit of corroboration as to
12   the facts surrounding Ben Baszler's testimony, which I'll
13   get in a minute.
14           Second of all, Officer Badour brought Ben Baszler
15   before the magistrate, before the Superior Court judge, who
16   made a credibility determination on his own, relied on that
17   question-and-answer, seeing him face-to-face, eye-to-eye,
18   and made that determination.
19           And then we had a hearing before the magistrate
20   judge in this courthouse that Your Honor was referring to,
21   and Your Honor was correct.  Now, it wasn't in regards to a
22   suppression hearing but there was a credibility
23   determination that had to be made --
24           THE COURT:  Okay.  That's what I was recalling.  I
25   thought they were both Franks hearings.
26           MR. DRATMAN:  Your Honor, that was not admitted
27   into evidence in this proceeding.
28           MR. STEGMAN:  Your Honor, what I would point out

```
 1      is the Government in its briefs laid that out, that, in
 2      fact, the magistrate judge relying -- the magistrate judge
 3      heard the testimony of Ben Baszler, and it wasn't just
 4      presented by the Government in a hearing before the judge,
 5      but it was -- there was cross-examination of Ben Baszler by
 6      the defense, by Mr. Carli's attorney --
 7                  THE COURT:  Was it --
 8                  MR. DRATMAN:  I was not there, Your Honor.
 9                  THE COURT:  Who was the attorney at that time?
10                  MR. STEGMAN:  At that time it was Quin Denvir.
11                  MR. DRATMAN:  I was not there.  The --
12                  THE COURT:  Just a minute.
13                  MR. STEGMAN:  I'm sorry if I was unclear.  I was
14      not referring to David Dratman.  I was saying defense
15      counsel for Mr. Carli.
16                  THE COURT:  Well --
17                  MR. STEGMAN:  In any event --
18                  (Clarification by the court reporter.)
19                  MR. DRATMAN:  That transcript was not offered,
20      Your Honor, as evidence.  It's not before this Court as --
21                  THE COURT:  I'm going to give you a chance to wind
22      up, Mr. Dratman.
23                  MR. DRATMAN:  I was simply objecting to the --
24                  THE COURT:  I'm going to give you a chance to wind
25      up, Mr. Dratman.
26                  MR. STEGMAN:  In these very proceedings there was
27      a -- Ben Baszler was examined and cross-examined by the
28      attorney at the time for David Carli.  And based on that
```

1    testimony, the defendant -- based partly on that testimony,
2    the defendant was detained.

3         And then, finally, Your Honor -- if I could have a
4    moment.

5         Although Mr. Dratman tried to frame this as though
6    the only information provided to Judge Tamietti to
7    determine whether or not there was probable cause was Ben
8    Baszler and his testimony and his statements by Sergeant
9    Badour in the written affidavit, there was actually quite a
10   bit more and there was corroboration.

11        And it was this:  Billy Beard testified to the
12   judge as part of the search warrant affidavit that he had
13   received numerous complaints -- that law enforcement had
14   received numerous complaints of juvenile boys hanging out
15   at the Carli house, including young boys spending the
16   entire weekend there; that the defendant had been giving
17   young boys money and gifts in return for sexual favors.

18        Investigator Beard personally spoke to another boy
19   other than Mr. Baszler who told him that the defendant pays
20   money to boys because he knows if the boys were to start
21   talking, the defendant could go to state prison for his
22   sexual activity with young boys.

23        Investigator Beard spoke to an employee of a
24   bicycle shop in town who indicated that the defendant, Mr.
25   Carli, quite frequently bought bicycle parts for young
26   boys.

27        Investigator Beard told the magistrate that he
28   spoke to a woman within the week who lives in plain sight

```
 1    of the Carli house, and that continuing activity daily of
 2    boys ages 12 to 14 coming over to the Carli house, some of
 3    the kids staying over the weekend.
 4            In addition to Billy Beard, Detective Casci
 5    testified before the magistrate judge prior to the
 6    magistrate judge --
 7            THE COURT:  Is it Cas-ky or Cash-y (phonetic)?
 8            MR. STEGMAN:  Cas-ky (phonetic), C-a-s-c-i, but
 9    pronounced Cashy (phonetic).
10            Right?
11            THE WITNESS:  Correct.
12            MR. STEGMAN:  Right.
13            He also corroborated the information.
14            He talked about the marijuana growing.  He said
15    that two months before he conducted an overflight of the
16    Carli property; saw marijuana under cultivation in the same
17    area as was found during previous overflights at about
18    service -- the service of the search warrants two years
19    earlier.
20            He said that this time it appeared that the
21    marijuana grow was twice the size as the previous time two
22    years before.  He also testified that he had personally
23    spoken with a woman two months before who told him that in
24    the area where the marijuana was growing, she saw two young
25    kids brought over by one or both of the Carli brothers.  So
26    there was quite a bit of corroboration.  It was not just
27    relying on the testimony of Ben Baszler.
28            And unless the Court has any -- at this point, I
```

 1   have nothing further.
 2             THE COURT:  Okay.  Mr. Dratman?
 3             MR. DRATMAN:  Excuse me.
 4             Your Honor, I do object to reference to matters
 5   that are not before this Court as a matter of evidence.
 6             The detention hearing transcript was not offered
 7   before this Court as an exhibit.  It should not be
 8   considered by this Court as a credibility determination for
 9   Ben Baszler or for anyone else for that matter.
10             I was not the attorney of record at that time, but
11   the issues were different --
12             THE COURT:  Well, the attorney that was referred
13   to, not too shabby.
14             MR. DRATMAN:  I couldn't agree more.
15             THE COURT:  Okay.  Get off that.  I'm not that
16   concerned about that issue.
17             MR. DRATMAN:  Well, I want to make clear that I
18   object --
19             THE COURT:  You made it clear.  Don't you
20   understand me?  I'm not concerned about that issue.
21             MR. DRATMAN:  What we have here is a situation
22   where Sergeant Badour candidly testified --
23             THE COURT:  You are on rebuttal now, Mr. Dratman.
24   I'm going to give you a little over five minutes to wind
25   up.
26             MR. DRATMAN:  That's fine.
27             In response to what the government has argued,
28   this is a situation in which Sergeant Badour candidly

1    conceded that he did not believe Baszler to be a credible

2    witness, which is why he wanted him brought before a judge

3    for a credibility determination to be made.

4         In order for a credibility determination to be

5    made, the person controlling the examination and who has

6    the background and the information should be candid in

7    disclosing those things that cause him to believe that the

8    witness is not credible.  If the Court reviews the oral

9    affidavit, you will see that was, in fact, not done.

10        There is nothing that is set forth concerning Mr.

11   Baszler and the reasons why Sergeant Badour, the affiant in

12   this case who did not deem Baszler to be credible, brought

13   him before the judge.  He didn't disclose any of those

14   things in that oral presentation, and, in fact, concealed

15   the promise that he had made to Baszler on the way to see

16   the judge.

17        A promise that was consistent with his desire to

18   have Baszler get to Carli's by having him released from

19   custody so that he could go in and be -- and surveil them

20   audio visually; something, by the way, which Judge Tamietti

21   did not authorize.

22        It is Sergeant Badour who wrote the affidavit,

23   Sergeant Badour who controlled the questioning of this

24   witness who he did not believe to be credible, and it's

25   Sergeant Badour that this hearing has been about.

26        The testimony of Investigator Beard, quite -- not

27   only -- it was almost an after thought.  And Investigator

28   Beard was not even readily able to remember the name of an

1   alleged witness, let alone give specific information that
2   was not stale relating to the events -- excuse me --
3   relating to the time period which was the present time
4   period at which they were seeking this warrant.
5           The information that was being provided by
6   Investigator Beard was not such that would have allowed the
7   wholesale examination of computers and electronic devices
8   and the matters that are subject of this proceeding, nor
9   did the testimony of -- of Agent Casci add anything to that
10  mix.
11          This -- and -- this is not a case where
12  objectively this Court can find that the Nevada County
13  Superior Court system could and did rely upon a search
14  clause as a justification for the search.  To the contrary.
15  This Court has before it the testimony before Judge
16  Tamietti on the motion to suppress evidence.  And nowhere
17  in the testimony of Sergeant Badour does he ever raise --
18  and that's at a time that's much closer to the events than
19  now -- does he ever raise the search clause as a
20  justification.  Nor is there anything that is indicated in
21  that transcript when they are in Nevada County, the
22  Superior Court --
23          THE COURT:  Can you remember the where I got the
24  idea about the --
25          MR. DRATMAN:  I do, Your Honor.  It is in the
26  search warrant affidavit.
27          THE COURT:  Okay.  That's what I thought.
28          MR. DRATMAN:  It is.  I concede there is a

```
 1    reference to it, a passing reference to it, which it says
 2    there was a conviction with search conditions.  It doesn't
 3    specify -- I think that's what the phrase was, there were
 4    search conditions or search and seizure conditions.
 5              THE COURT:  I raised it after I was alerted to the
 6    fact that that was in the affidavit some time ago.
 7              MR. DRATMAN:  Yes.  You were the one that raised
 8    it.  It was not raised by the Government in response to the
 9    documents that I had filed.  It was the Court that raised
10    the issue, not the Government.  And it was -- this Court
11    was the first Court, the first lawyer, the first anything
12    to raise it.  And it wasn't even raised in Nevada County,
13    which, by the way, is an indication -- circumstantial
14    evidence -- that if the procedure in Nevada County was that
15    the search clause that accompanied that misdemeanor
16    conviction was the justification for the search, don't you
17    know that a Nevada County District Attorney would have
18    raised that issue and said to Judge Tamietti, "Judge,
19    doesn't matter.  It's all moot."  And it --
20              THE COURT:  I don't know why he didn't, and I'm
21    not going to speculate on that.
22              MR. DRATMAN:  What we know, though, is he didn't
23    do it, and that requires no speculation.
24              THE COURT:  I said I'm not going to speculate as
25    to why he didn't.
26              MR. DRATMAN:  Well, we don't have to.  We have the
27    testimony of Steve Munkelt as to why that was not done.
28    And it was consistent with the policy that he was aware of
```

1    and that he executed in the plea agreement that he

2    fashioned for Mr. Carli in more specific terms in the 2004

3    case.

4           THE COURT:  Well, that's a factual issue.  I heard

5    evidence on both sides on that issue.

6           MR. DRATMAN:  Yes, you did.  And I would say the

7    circumstantial evidence is in favor of the -- well, it

8    certainly --

9           THE COURT:  Mr. Dratman, that's what you are paid

10   for, to take that side.

11          I'm going to have to decide the credibility issue.

12          MR. DRATMAN:  Your Honor, I have never been less

13   than candid with this Court.  When the Court has --

14          (Clarification by the court reporter.)

15          THE COURT:  Don't make brash statements, Mr.

16   Dratman.

17          MR. DRATMAN:  The Court --

18          THE COURT:  Stick to the case.

19          MR. DRATMAN:  The Court asked me earlier whether

20   or not there was a reference to a search condition in the

21   affidavit, I readily conceded there was.  And I -- I am not

22   paid to make arguments to this Court that are spurious, and

23   I --

24          THE COURT:  Let's stick to the case.  All lawyers

25   are paid to spin the facts, and you are, too.

26          MR. DRATMAN:  And in this case, the facts do not

27   permit a finding that the search condition was a

28   justification --

1           THE COURT:  I know that's your position.

2           MR. DRATMAN:  Yes.

3           MR. DRATMAN:  I -- I --

4           The reference to the questioning of Mr. Baszler by

5      the Court concerning whether or not any promises have been

6      made was different than what the Court asked.  The Court

7      said, (reading) Is that correct, after making a definitive

8      statement, and twice Mr. Baszler said "no."  There was no

9      follow-up.

10          Again, as the Court just pointed out to me, we

11     shouldn't be speculating as to what was meant there.  The

12     words speak for themselves.  And not only do the words

13     speak for themselves, we have a sergeant that spoke and

14     told this Court for the first time in any of the

15     declarations that have been filed in any of the testimony

16     that Mr. Baszler was told something which he didn't say had

17     been promised to him, but he was told before he went before

18     Judge Tamietti that the probation violation, that the

19     $50,000 bail, was going to be dismissed.

20          That is the kind of candor that should have been

21     given to this Court at the outset and was not.  That was

22     the kind of candor that should have been given to Judge

23     Tamietti and was not.

24          This proceeding relating to Baszler is a -- is a

25     proceeding in which, truly, the wool was pulled over Judge

26     Tamietti's eyes.  In the manner in which a sergeant --

27          THE COURT:  You are running out of time, Mr. --

28          MR. DRATMAN:  -- and --

```
 1              THE COURT:  Besides that, you are repeating
 2    yourself.
 3              MR. DRATMAN:  I would ask the Court, then, to
 4    grant the motion to suppress.
 5              THE COURT:  All right.  The matter is under
 6    submission.  I'm going to take a few minutes to consolidate
 7    my notes.
 8              Five minutes, Counsel.
 9              (Recess taken.)
10              COURTROOM DEPUTY:  Please remain seated.  Court is
11    now in session.
12              THE COURT:  The record will show all the proper
13    parties are again before the Court.
14              The case today is on calendar for continued
15    hearing on Defendant's motion to suppress.  The notice was
16    filed last November -- the motion was filed last November
17    2009 seeks to suppress the results of five separate search
18    warrants over a period of seven days spanning nine months.
19              The Court has held hearings on the various
20    warrants.  On January 29th, this year, I provided an oral
21    analysis and denied the motion to suppress the evidence
22    seized from the first three search warrants.  They were
23    numbered 2161, 2163 and 2164.
24              On March 22 and May 7, 2010, I heard arguments
25    concerning one aspect of the remaining two motions, the
26    scope of the search and seizure term attached to
27    defendant's probation, and I took the matter under
28    submission.
```

1             On May 12th, 18th and 25th of this year, the Court
2   held a Franks hearing listening to six witnesses, one of
3   whom his testimony has been continued to today.
4             I recite this history to let you know that it is
5   my intention to finish the hearing and decide the motion
6   today.
7             I do not a appreciate the way the case has
8   proceeded.  For reasons I don't quite understand, it has
9   been pending for over four years.  As I mentioned earlier,
10  it was indicted in August of 2006.  In the initial briefing
11  schedule agreed to by the parties, the motion to suppress
12  was to be filed in August of 2007 with a hearing in October
13  of 2007.  However, the motion wasn't even filed until
14  November of 2009.  And, as I have noted, the hearing on the
15  motion has been drawn out over a period of 11 months.
16            Before the Court now is the motion to suppress
17  evidence, mostly a computer and computer related equipment
18  seized November 2, 2004, pursuant to a Nevada County
19  Superior Court search warrant numbered 2353, and a United
20  States District Court search warrant numbered 05-0354.
21            After reading the briefs, reviewing the law, and
22  hearing the testimony of witnesses, the motion to suppress
23  is now denied on three separate grounds.
24            I want to advise counsel that I have been prepared
25  for some of these notes for over six months; however, I
26  never have been completely satisfied as to why this matter
27  has been continued so long.  In any event, as to the three
28  independent grounds on which I deny the motion:  First, the

1    evidence before me and the case law make clear that
2    defendant was on searchable probation.  The terms of which
3    authorized the search and subsequent seizure conducted in
4    November 2004 that is the subject of this fourth search
5    warrant.

6         Officer Badour's affidavit in support of the
7    warrant noted that defendant and his brother were on
8    summary probation with a search and seizure term.  It makes
9    no difference that Officer Badour sought a search warrant
10   in addition to relying on the search terms of defendant's
11   probation.

12        Contrary to defendant's argument, the terms of
13   defendant's searchable probation were not limited to drug
14   offenses and drug paraphernalia.  The testimony of Attorney
15   Stephen Munkelt in that connection does not support a
16   contrary conclusion.

17        Both the Supreme Court and the Ninth Circuit case
18   law hold that a warrant with searches of a probationer's
19   residence are permissible under the 4th Amendment when
20   authorized by probation condition and supported by
21   reasonable suspicion of criminal activity.

22        In that connection see the Supreme Court Knight's
23   case cited in the Government's brief.  The probation
24   condition under examination by the Supreme Court in Knight
25   is almost identical to the one at issue here.  It was a
26   condition of summary probation for a drug offense in a
27   California court.  It subjects the probationer to submit
28   himself -- it subjected the probationer to submit himself,

1    his property, home, vehicle or personnel effects at any
2    time to search without a warrant by either a probation
3    officer or law enforcement officer, and it was signed by
4    the probationer stating that he understood and agreed to
5    its terms.
6         The probation order is in the instant case, and
7    the instant case contains the identical terms plus language
8    requiring the probationer to admit to search with or
9    without reasonable or probable cause.
10        The Knight's holding has been affirmed in several
11   Ninth Circuit cases, including most recently U.S. v. Mayer,
12   560 Federal 3d 498 at page 956, a 2009 case not cited by
13   the parties.
14        Mayer teaches that warrant with searches of
15   probationer's residences are permissible under the Fourth
16   Amendment when authorized by a probation condition and
17   supported by reasonable suspicion of criminal activity.
18        Here, the Government contends, and I now find,
19   that a reasonable suspicion of criminal activity justifying
20   the search of the defendant's Zion street residence in
21   November of 2004 is supplied by the statements of Detective
22   Beard and Officer Casci made to Judge Tamietti as part of
23   the oral affidavit supporting the 2004 search warrant.
24        Detective Beard, an investigator with the Nevada
25   County District Attorney's office told Judge Tamietti that
26   he had been conducting an investigation of the defendant
27   and his brother and the comings and goings at the Zion
28   street address for two years.  Specifically, Beard stated

1    that he had information from a young boy, who he named, who

2    as a minor had been a victim of the defendant and had

3    received money from defendant in exchange for sex.

4           Beard also said he had received a -- he had

5    received complaints from a neighbor about young boys, 12

6    and 14 years of age, frequenting the residence daily and

7    staying the night or weekend.

8           Officer Casci testified he had conducted marijuana

9    overflights as recently as two months prior to issuance of

10   the November 2004 warrant and saw cultivation twice the

11   amount of what he had seen on the 2002 warrants.

12          Officer Casci also related information he had

13   received from one Gail Block of her observance:

14   Observations of the defendant and his brother transporting

15   young boys under 18 years of age to and from the property.

16          The information is sufficient to support

17   reasonable suspicion, justifying the search of the

18   defendant and his residence pursuant to the search

19   condition of his probation.

20          Secondly, I find that the warrant was supported by

21   probable cause to believe that evidence of marijuana

22   trafficking and child pornography would be found.  The

23   information presented to the issuing magistrate in this

24   case, Nevada County Superior Court Judge Tamietti,

25   consisted of a written affidavit of Officer Badour and the

26   oral testimony of one Benjamin Baszler, Officer James Casci

27   and Detective Beard, also.

28          Officer Badour's affidavit recounted in detail

information provided by Baszler about his own molestation
by Defendant in exchange for money and marijuana; by
pictures he saw on Defendant's computer of young naked boys
between the ages of 10 and 12; Baszler's knowledge that
Defendant had provided other juveniles with marijuana,
money and alcohol in exchange for sex; and Baszler's
statement that he had been provided marijuana by Defendant
within the previous three weeks.

In addition, the affidavit detailed the results of
previous searches of Defendant and his residence which had
culminated in Defendant's prosecution for and conviction of
marijuana offenses for which Defendant was on probation at
the time of the search.

Defendant contends that Baszler's information must
be disbelieved since he has recanted some of the statements
made in the affidavit.  However, it is not Baszler's
credibility which is at issue in the affidavit; rather it
is that of the affiant, Badour.  In any event, the issuing
magistrate, Judge Tamietti, questioned Baszler himself.
Moreover, the recantation, which itself has been recanted,
occurred after Baszler's testimony before the issuing
magistrate.

Defendant argues, however, that Baszler's
testimony was the product of threats and coercion from law
enforcement, information the affiant failed to provide the
judge.  While Defendant is -- Defendant's allegations of
intentional misrepresentation and omissions entitled him to
an evidentiary hearing, having now heard testimony from

1   both Baszler and Badour, I find Defendant's arguments
2   without merit.
3        Officer Badour had no reason to doubt the
4   information he had provided he was provided by Baszler, nor
5   has Defendant shown that Baszler misrepresented or omitted
6   information that would have affected the validity of the
7   search warrant.
8        Third, even with the Court to read out or redact
9   Baszler's statement to Judge Tamietti as well as Badour's
10  statement concerning Baszler -- concerning Baszler, the
11  affidavit itself contains sufficient independent evidence
12  to support a finding of probable cause.  As mentioned
13  before, the affidavit specified evidence found during prior
14  searches of Defendant's residence, including child
15  pornography, and the oral portion of the affidavit
16  concluded the testimony of Detective Beard and Officer
17  Casci about an ongoing investigation of the defendant and
18  his brother concerning underaged boys, drugs and money.
19        In that connection, I refer the parties to the
20  evidence cited in connection with the earlier part of my
21  rulings concerning reasonable suspicion and probation
22  searches.
23        For all of these reasons, the Defendant's motion
24  to suppress the results of the state search warrant
25  numbered 2353 is now denied.  And since the only items
26  seized pursuant to Federal Search Warrant Number 05-354 was
27  a computer hard drive taken pursuant to that same -- to
28  that state search warrant, the motion to suppress the

1    results of the federal warrant is also denied.

2            Mr. Stegman, would you prepare a summary order of

3    the Court's decision on the motion to suppress, and you can

4    include, if you want, the reporter's transcript of the

5    several proceedings with the Court  -- where the Court has

6    made its oral decision.  And dependent on how soon the

7    reporter can get you transcripts if you request them, would

8    you see if you can get that done within ten days?

9            MR. STEGMAN:   Yes, Your Honor.

10           THE COURT:   I'm now going to set the matter for

11   trial.

12           MR. DRATMAN:   Your Honor, if the Court could, Mr.

13   Ortiz was going to be here today.  He suffered a death in

14   his family.

15           THE COURT:   Mr. Dratman, I'm going to set the case

16   for trial now.  It's been going on long enough.  And the

17   main reason I'm setting it for trial now, I will also set a

18   trial confirmation hearing.

19           The date that we picked the trial confirmation

20   hearing will be the last date the Court will entertain a

21   negotiated plea.

22           I'll take suggestions from counsel.

23           I want to tell you, Mr. Dratman, you pick a date

24   now, that's it.  You understand?

25           MR. DRATMAN:   I do, Your Honor.  I don't know if I

26   can reach Mr. Ortiz --

27           THE COURT:   I don't care if you reach him or not.

28   I'm going to set the trial date now.  Pick a date.

```
 1              MR. DRATMAN:  May I have a chance to talk to
 2      counsel?
 3              THE COURT:  Why?
 4              MR. DRATMAN:  Okay.  Then -- then --
 5              THE COURT:  I'll ask counsel for the Government if
 6      they object to the date you pick after I tell you if I
 7      object.
 8              Frankly, Mr. Dratman, I would think that you would
 9      have some feelings for your client -- who has been over in
10      the county jail for over four years -- in setting the trial
11      date as quick as possible.
12              MR. DRATMAN:  Your Honor, I'm going to ask the
13      Court to set the trial in April.  I have other matters.  I
14      don't know what Mr. Ortiz's schedule is, but I'm hopeful he
15      doesn't have any matters then.  I would suggest mid to late
16      April for trial date.
17              THE COURT:  That's agreeable with the Court.
18              Mr. Stegman?
19              MR. STEGMAN:   It's agreeable with the Government,
20      Your Honor.
21              COURTROOM DEPUTY:  I didn't hear the date.
22              When?
23              THE COURT:  Sometimes in April.
24              COURTROOM DEPUTY:  Okay.
25              THE COURT:  2011, by vote.
26              COURTROOM DEPUTY:  Well, we can do it any Monday
27      in April for trial.
28              THE COURT:  Let's take the first Monday.
```

```
 1              MR. DRATMAN:  Your Honor, no.  I can't do that.
 2    We still have stuff that we need to do.  I was hoping --
 3              THE COURT:  Mr. Dratman, if you haven't done it in
 4    over four years, I think your client should go back to Mr.
 5    Denvir.
 6              MR. DRATMAN:  Your Honor, I don't want to get into
 7    a debate with the Court.  The Court asked me to pick a
 8    date.  I asked for the latter part of April.  I would
 9    suggest April 25th.
10              THE COURT:  Mr. Stegman?
11              MR. STEGMAN:   That's fine with the Government.
12              COURTROOM DEPUTY:  April 25 is fine for us.
13              THE COURT:  Jury trial will commence April 25,
14    2011, at 9:00 a.m.; however, I require counsel to be in
15    court on trial date at 8:30 a.m. to go over in limine
16    instructions and housekeeping matters.
17              The trial confirmation hearing will be two weeks
18    before April 25.
19              COURTROOM DEPUTY:  That would be Friday, April
20    8th.
21              THE COURT:  Trial confirmation hearing, April 8th,
22    2011, at 10:00 a.m.
23              I can't impress on counsel any more strongly than
24    I already have by reciting history of this case that this
25    trial is going to go on the date that we just scheduled.
26              Mr. Carli?
27              THE DEFENDANT:  Yes, Your Honor.
28              THE COURT:  I don't want to get involved with any
```

```
 1    discussions you may have with your attorney, but you ought
 2    to impress on him why I want this trial to be tried as
 3    early as possible considering that you are going to be in
 4    custody all this time.
 5              Do you understand?
 6              THE DEFENDANT:  Yes, Your Honor.
 7              THE COURT:  If you can't -- pardon?
 8              THE DEFENDANT:  It's been a very, very difficult
 9    time for me.
10              THE COURT:  I can imagine that.
11              THE DEFENDANT:  I've just been hanging on by a
12    thread.  I don't know if I can make it that far, really.
13              THE COURT:  I can imagine that.  If you can't
14    convince Mr. Dratman to get to trial as soon as possible,
15    which is the date we just picked, you might consider other
16    counsel who is not as busy as Mr. Dratman.
17              THE DEFENDANT:  Your Honor, it's been a very
18    expensive procedure for me.  It's cost over $230,000, four
19    years --
20              THE COURT:  Okay.  I understand --
21              THE DEFENDANT:  Yes.
22              THE COURT:  -- you have a lot invested in this.
23              THE DEFENDANT:  Yes.
24              THE COURT:  I just want you to know that I have in
25    mind the time that you have been doing over there in jail
26    without --
27              THE DEFENDANT:  Thank you.  I appreciate your
28    concern.
```

```
 1                THE COURT:  Okay.  I'll continue -- I'll find
 2    excludable time from today to the trial date, April 25,
 3    2011, if you will so stipulate, Mr. Dratman, having picked
 4    that date?
 5                MR. DRATMAN:  I do, Your Honor.
 6                THE COURT:  It would be under Local Code T4,
 7    attorney preparation.
 8                MR. DRATMAN:  I do, Your Honor, but I -- I am
 9    quite concerned about comments that the Court invited my
10    client to make that are distressing to me that relate to
11    information that I may have to respond to.  And I have to
12    consider my ethical obligations as well as my duty to my
13    client.  And I'm concerned about that.  And I tell the
14    Court that I'm concerned about what the colloquy was
15    between the Court and my client.
16                THE COURT:  Okay.  I'm concerned about you, Mr.
17    Dratman.
18                I'll see you on trial confirmation hearing date.
19                MR. STEGMAN:   Thank you, Your Honor.
20                THE COURT:  Somebody wanted to say something?
21                MR. STEGMAN:   No, Your Honor.  I said thank you,
22    Your Honor.
23                COURTROOM DEPUTY:  What about the exhibits?
24                THE COURT:  Can I have a stipulation that all
25    exhibits can be returned to their proponent to be preserved
26    for trial --
27                MR. STEGMAN:   So stipulated.
28                THE COURT:  -- or other reasons?
```

1          MR. STEGMAN:   So stipulated.

2          COURTROOM DEPUTY:  We usually ask them to preserve

3   for appeal.

4          THE COURT:  Or for appeal.

5          MR. DRATMAN:  Actually, Your Honor, would it be

6   all right if we agreed that the Government could keep all

7   the exhibits together for that purpose?  I just --

8          THE COURT:  Your exhibits, too?

9          MR. DRATMAN:  That's fine.

10          THE COURT:  That okay with you, Mr. Stegman?

11          MR. STEGMAN:   Yes, Your Honor.

12          THE COURT:  You got it.

13          (Court adjourned at 4:35 p.m.)

14

15

16                    ---o0o---

17

18

19

20

21

22

23

24

25

26

27

28

1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2    STATE OF CALIFORNIA    )
                            ) ss.
3    COUNTY OF SACRAMENTO   )

4

5        I, JULIE STINNETT, a Certified Shorthand Reporter,

6    licensed by the State of California, hereby certify that I

7    was duly appointed and qualified to take the foregoing

8    matter;

9        That the said proceeding was taken before me, in

10   stenotype notes, and was thereafter transcribed, under my

11   direction, by computer-assited transcription;

12       That the foregoing transcript constitutes a true and

13   correct report of the testimony given and proceedings which

14   then and there took place; that I am a disinterested person

15   to the said action.

16       IN WITNESS WHEREOF, I have hereunto subscribed my

17   signature on this_____day of_____, 2010.

18                            _____
19                            JULIE STINNETT, CSR
20                            Certified Shorthand Reporter
                              California License 11578
21

22

23

24

25

26

27

28

                                                              83